[Cite as *State v. Sultaana*, 2016-Ohio-199.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 101492

---

### STATE OF OHIO

#### PLAINTIFF-APPELLEE

vs.

### HAKEEM SULTAANA

#### DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-571616-A

**BEFORE:**  E.T. Gallagher, J., Jones, A.J., and Stewart, J.

**RELEASED AND JOURNALIZED:**  January 21, 2016

**FOR APPELLANT**

Hakeem Sultaana, pro se
Inmate Number 654-265
Lake Erie Correctional Institution
P.O. Box 8000
Conneaut, Ohio 44030


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:    James A. Gutierrez
       Erica Barnhill
Assistant Prosecuting Attorneys
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN T. GALLAGHER, J.:

{¶1} Defendant-appellant, Hakeem Sultaana ("Sultaana"), appeals his convictions and sentence. He raises four assignments of error for our review:

> 1. Hakeem Sultaana was deprived of his liberty without due process of law, where his conviction for engaging in a pattern of corrupt activity is insufficient as a matter of law.
>
> 2. The trial court erred by refusing to grant Mr. Sultaana's Rule 29 motion for acquittal on the tampering with records charges because those counts were more specifically and properly charged under R.C. 4505.01, providing false statements on requests for duplicate titles.
>
> 3. The trial court erred in failing to merge the securing writings by deception and theft by deception as allied offenses of similar import.
> 4. The trial court imposed a sentence contrary to law and violated Hakeem Sultaana's Fourteenth amendment right to due process and Sixth amendment right to trial by jury when it punished Sultaana for exercising his right to trial.

{¶2} We find no merit to the appeal and affirm.

## I. Facts and Procedural History

{¶3} In February 2013, the Cuyahoga County Grand Jury issued a 102-count indictment charging Sultaana and 18 codefendants with various offenses, including engaging in a pattern of corrupt activity, tampering with records, securing writings by deception, forgery, grand theft, and unclassified felony title offenses. The state dismissed, without prejudice, the charges against four codefendants who were unavailable for trial, and the remaining 14 codefendants entered plea agreements with the state in exchange for truthful testimony at Sultaana's trial.

{¶4} The state alleged that Sultaana was the mastermind of a theft ring, which was responsible for stealing over $47,625 from title loan companies, such as LoanMax (a.k.a Integrity Funding) and Ace Cash Express. Sultaana and the codefendants obtained title loans on vehicles

using false information on loan applications and falsified certificates of auto titles. The codefendants, who testified at trial, recounted similar stories of how Sultaana, and/or his girlfriend, helped them complete loan applications secured by falsified auto titles. As soon as a loan was obtained, Sultaana directed the individuals to obtain duplicate auto titles from local title bureaus in order to procure a second loan from a different loan company. Sultaana discovered that it took seven to ten days before the liens from the loans appeared on record at the Ohio Bureau of Motor Vehicles ("BMV") and that second loans could be obtained during this time without the second lender knowing of any prior loans or liens on the title.

{¶5} One of Sultaana's girlfriends, Angel Strong, testified that she assisted Sultaana and at least four individuals to obtain fraudulent loans. (Tr. 2089-2100, 2112-2138.) According to Strong, Sultaana forged whoever's name was originally on the title in order to transfer it into a codefendant's name so that the codefendant could apply for a title loan. Strong and Sultaana subsequently went with the individual to a loan company where the codefendant obtained a loan with the falsified title. Strong testified, as did numerous codefendants, that Sultaana kept most of the cash received from the loans even though the codefendants were the named borrowers, who were responsible for repayment. In each case, Sultaana promised the codefendants, who were his friends and acquaintances, that he would promptly repay the loans on their behalf.

{¶6} According to Strong, Sultaana used a notary stamp belonging to his friend, Susan Palcisco, and forged Palcisco's name to notarize documents associated with some of the transactions. (Tr. 2079-2080.) Palcisco admitted at trial that she also notarized several documents for Sultaana that she knew were forged. (Tr. 2184-2186.) An elderly friend notarized other documents for Sultaana and his codefendants. Strong and several witnesses

testified that Sultaana paid all the fees associated with the duplicate auto titles and loan applications.

{¶7} Michael Russo ("Russo"), a detective with the Ohio BMV, investigated a report that customers of two loan companies, Ace Cash Express and LoanMax, were obtaining duplicate titles to fraudulently secure title loans. At the time of the report, Russo was not aware of any lag time between the time a loan was extended and the time the lien appeared on the title in the BMV database. Russo searched the BMV database and discovered a recurring pattern in which a title was used to procure a loan, a duplicate title was subsequently obtained, and a second loan was made on the duplicate title.

{¶8} According to Russo, there were also commonalities within several of the loan documents. For example, several applicants listed Unique Auto Sales, located at 4364 West 130th Street, as a place of employment. Russo discovered that Sultaana previously worked at Unique Auto Sales, which was once a car dealership at that location, but the dealership had been out of business for several years. The location where the dealership had existed was a now vacant lot with weeds poking through cracks in the cement. (Tr. 3008.)

{¶9} Russo also found that the license plates listed for the vehicles in the loan applications typically did not belong to the vehicle. The vehicles actually had temporary tags for which no permanent tags had been issued. Russo further discovered that Sultaana was also known as "Kevin Hughley" and the name "Kevin Hughley" was listed on several loan documents as the applicant's employer. Sultaana's cell phone number was frequently listed on the applications, but the last digit was changed.

{¶10} Russo testified that he created a data sheet depicting the fraudulently secured loans in chronological order. The data sheet listed the loans, duplicate titles, additional loans, and

scrapping of some vehicles.   Russo stated: "I was able to establish a pattern within the first four transactions by the individuals."   (Tr. 3024.)

{¶11} At the conclusion of the trial, the jury found Sultaana guilty of 94 counts in the indictment, including engaging in a pattern of corrupt activity and grand theft.   They also found him guilty of all the attendant furthermore specifications.   The court sentenced Sultaana to a ten-year prison term for engaging in a pattern of corrupt activity, four years on each of the unclassified felony title offenses, and shorter sentences on the forgery, tampering with records, theft, and securing writings by deception convictions.   The court ordered the shorter sentences to run concurrently with the ten-year sentence.   However, the court ordered the ten-year prison term to be served consecutive to the concurrent four-year terms on title offenses for an aggregate 14-year prison term.

{¶12} Sultaana, through appointed counsel, filed a timely notice of appeal, and counsel filed a comprehensive merit brief.   Sultaana later requested removal of his appointed counsel, and we granted the request.   Sultaana filed a motion for new counsel, and we appointed the state public defender to represent him.   The state public defender subsequently moved to withdraw as counsel.   We denied the motion and gave Sultaana three options (1) retain new counsel, (2) proceed pro se, or (3) work with appointed counsel.   Sultaana rejected all three of these options and gave notice that he had instituted proceedings against appointed counsel in the federal district court.   Thereafter, we granted counsel's second motion to withdraw as counsel.

{¶13} Throughout several months, Sultaana filed numerous pro se motions even when he was represented by counsel.   On October 1, 2015, we declared Sultaana a vexatious litigator and ruled that "Sultaana is prohibited from instituting any appeals or original actions, continuing appeals or original actions, or filing pro se motions in any pending appeal without leave of

court." After granting appointed counsel's motion to withdraw, we granted Sultaana's request to proceed pro se provided that Sultaana refrain from filing any motions, notices or briefs without first obtaining leave of court, and that the appellate brief filed by Sultaana's first lawyer would be considered his brief on appeal.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶14} In the first and second assignments of error, Sultaana challenges the sufficiency of the evidence supporting his engaging in a pattern of corrupt activity and tampering with records convictions. The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

### 1. Engaging in a Pattern of Corrupt Activity

{¶15} Sultaana contends there was insufficient evidence to support his engaging in a pattern of corrupt activity conviction. He contends that although there was evidence of a pattern of activity, there was no evidence of an enterprise, which is a necessary element of the offense.

{¶16} Ohio's Racketeer Influenced and Corrupt Organizations Act ("RICO") was modeled after the federal RICO Act, 18 U.S.C. 1961 et seq. and Ohio courts have applied federal case law in Ohio RICO cases. *State v. Beverly*, 143 Ohio St.3d 258, 2015-Ohio-219, 37 N.E.3d 116, ¶ 3.[1] R.C. 2923.32(A)(1) provides, in relevant part that "[n]o person * * * associated with

_____

[1] The Ohio Supreme Court explained that it relied on several United States

any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity." R.C. 2923.31 defines "pattern of corrupt activity" as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."

{¶17} Thus, in order to prove a RICO offense, the state must prove that (1) the defendant committed two or more predicate offenses, (2) the defendant was "employed by, or associated with" an "enterprise," and (3) the defendant conducted or participated in the enterprise "through a pattern of corrupt activity." *State v. Miranda*, 138 Ohio St.3d 184, 2014-Ohio-451, 5 N.E.3d 603, ¶ 13, citing R.C. 2923.32(A)(1). "'The conduct required to commit a RICO violation is independent of the conduct required to commit [the underlying predicate offenses].'" *Id*., quoting *State v. Dudas*, 11th Dist. Lake Nos. 2008-L-109 and 2008-L-110, 2009-Ohio-1001, ¶ 46. "The intent of RICO is 'to criminalize the pattern of criminal activity, not the underlying predicate acts.'" *Id*., quoting *State v. Thomas*, 3d Dist. Allen Nos. 1-11-25 and 1-11-26, 2012-Ohio-5577, ¶ 61.

{¶18} R.C. 2923.31(C) defines "enterprise" as including

any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. "Enterprise" includes illicit as well as licit enterprises.

---

Supreme Court cases "not because they are the law of the land, [they are not in Ohio, R.C. 2923.31 and 2923.32 are], but because the reasoning applied by the Supreme Court is logical and apt." *Id*. at ¶ 14. In *Beverly*, the court specifically relied on *Boyle v. United States*, 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009).

In this case, the alleged enterprise was not a legal entity, but an "association in fact." To establish an "association in fact" under R.C. 2923.31(C), there must be "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265 at 938. "[M]erely committing successive or related crimes is not sufficient to rise to the level of a RICO violation." *State v. Schlosser*, 79 Ohio St.3d 329, 333, 681 N.E.2d 911 (1997).

{¶19} Sultaana argues there was no evidence of a conspiracy or "association in fact" because the crimes were nothing but a series of unrelated transactions between Sultaana and each individual codefendant. Although the existence of an "enterprise" is a separate element from the "pattern of corrupt activity" that must be proved beyond a reasonable doubt, an enterprise may be inferred from the evidence indicating associates engaged in a pattern of corrupt activity. *Boyle*, 556 U.S. at 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265. The Ohio Supreme Court recently held that "the existence of an enterprise, sufficient to sustain a conviction for engaging in a pattern of corrupt activity under R.C. 2923.32(A)(1), can be established without proving that the enterprise is a structure separate and distinct from a pattern of corrupt activity." *Beverly,* 143 Ohio St.3d 258, 2015-Ohio-219, 37 N.E.3d 116, at syllabus.

{¶20} The facts of *Beverly* are helpful in determining whether an enterprise may be inferred from the defendant's conduct. In *Beverly*, the court held that the existence of an enterprise could be inferred from the fact that the defendant and one other person stole three vehicles, which they used to commit several burglaries. *Id*. at ¶ 16. In reaching this conclusion, the court reasoned that "the definition of 'enterprise' is remarkably open-ended." *Id*. at ¶ 8. However, it is significant that the two co-conspirators collaborated to commit several offenses at different times.

{¶21} In *State v. Montoya*, 12th Dist. Clermont No. CA2012-02-015, 2013-Ohio-3312, ¶ 55, the court found sufficient evidence to support the defendant's RICO conviction based on drug possession and trafficking conduct because the defendant and a codefendant had a purpose to sell heroin on at least three occasions, they formed relationships to engage in that conduct, and there was longevity because the transactions occurred over the course of a month.

{¶22} At first, the series of transactions involving Sultaana and each individual codefendant appears to have "wheel and spoke" structure, with Sultaana at the hub and the individual codefendants in the "rim." Conspiracies involving a "wheel and spoke" structure require proof that each defendant in the "rim" knew or had reason to know of the scope of the conspiracy and that "'each defendant had reason to believe that their own benefits were dependent upon the success of the entire venture.'" *United States v. Kenny*, 645 F.2d 1323 (9th Cir.1981), quoting *United States v. Kostoff*, 585 F.2d 378, 380 (9th Cir.1978). Sultaana argues that since the codefendants were unaware of one another and the pattern of corrupt activity, there was no proof of an enterprise.

{¶23} However, the evidence at trial demonstrated that at least two codefendants teamed up with Sultaana in the commission of numerous offenses with the other individual codefendants and would be considered the "hub" of the wheel with Sultaana. Susan Palcisco testified that she notarized false auto titles "a good handful of times," knowing that Sultaana used the titles to fraudulently obtain loans with other codefendants.[2] (Tr. 2191.) Palcisco testified that she could

---

[2] Although Palcisco did not specifically testify to having knowledge of the conspiracy's purpose, her knowledge can be inferred by the fact that she admitted notarizing countless blank documents and signatures of individuals who were not present, together with the fact that Sultaana assisted Palcisco in obtaining a falsified title and loan in her own name. As previously stated, in a sufficiency analysis, we review the evidence in a light most favorable to the prosecution to

not remember the number of forged documents she notarized for Sultaana because "[t]here was too many of them." (Tr. 2191.) Palcisco also stated that Angel Strong accompanied her and Sultaana when she used a falsified auto title to get a loan for $2,500, of which she received $200, and Sultaana kept the rest. (Tr. 2198.) Palcisco agreed to take out the loan because Sultaana told her he needed the money and she wanted to help him since they were "associates." (Tr. 2234.)

{¶24} Palcisco also testified that she lent her notary stamp to Sultaana. Sometime later, Strong and Sultaana persuaded Palcisco to sign a letter authenticating her notary signature on an auto title that had been rejected because a clerk at the title bureau did not believe it was genuine. (Tr. 2193-2194.) Palcisco acknowledged they wanted her to sign the authentication letter because Sultaana had "notarized a title and had it signed, and [the signature] didn't match my signature so they wouldn't let the title go through." Although she was concerned by the deception, she nevertheless signed the letter. The fact that Palcisco helped Sultaana obtain fraudulent certificates of title for the purpose of securing loans by deception established that Palcisco had a relationship with Sultaana that helped Sultaana pursue the enterprise's purpose. Sultaana's association with Palcisco, by itself, was sufficient to prove the existence of an enterprise.

{¶25} The evidence also established that Angel Strong participated in fraudulent transactions with Sultaana and at least four other codefendants at different times and locations. For example, Strong and Sultaana helped codefendant Natasha Reyes transfer the title to her

determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus.

boyfriend's car into Reyes's name after which Strong helped Reyes complete a loan application with fraudulent information.   (Tr. 2091, 2400-2408.)

{¶26} On another occasion, Strong, Sultaana, and codefendant Sarah McCown obtained a fraudulent loan in McCown's name from LoanMax.  (Tr. 2112-2114, 2249-2265.)   They first went to a title bureau where Sultaana assisted McCown in transferring the title of someone else's vehicle into her name.   With respect to the loan process, Strong testified:

Q: Was there any information given to Sarah regarding what to put down on the loan application?

A: Just the income and how much she made at work.

Q: Okay.   And who gave that information to whom?

A: Kevin gave it to me, and I gave it to her.

According to Strong, McCown received a loan for "a little over a thousand dollars," of which Sultaana gave her "a little over 150 dollars."   (Tr. 2119.)

{¶27} Strong assisted codefendant Stephanie Lenz in completing a loan application with false information after Sultaana helped her procure a falsified title to a vehicle.   Sultaana took most of the loaned money and gave "a little bit of money" to Strong and Lenz.  (Tr. 2133.) After receiving the loan, Strong and Sultaana helped Lenz get a duplicate title so the vehicle could be sold for scrap.   (Tr. 2135-2136.)

{¶28} Strong also collaborated with Sultaana and Palcisco to secure a loan in her own name.   Strong testified that she and Sultaana fraudulently transferred the title to Sultaana's mother's Honda into Strong's name, which Sultaana notarized with Palcisco's notary stamp. (Tr. 2079.)   Strong used the falsified title to obtain a loan in the amount of $8,000 from LoanMax.  (Tr. 2075.)   Sultaana took most of the money and gave $2,500 to his mother.   In

exchange for Strong's role in the transaction, Sultaana gave Strong a gram of heroin and a pair of shoes. (Tr. 2075.)

{¶29} Although Strong received little money from the loan transactions, she received "gifts," mostly in the form of drugs, in exchange for her participation. (Tr. 2099.) Strong's testimony alone is sufficient to establish that Strong and Sultaana associated for the purpose of committing a pattern of corrupt activity. Both Strong's and Palcisco's testimony demonstrates that they played larger roles in the conspiracy than the individual codefendants at the "rim"; they were in the "hub" of the wheel with Sultaana.

{¶30} The evidence showed that Sultaana engaged in numerous fraudulent transactions at title bureaus and loan companies with various codefendants. The collaborative actions of Strong, Palcisco, and Sultaana established the enterprise element of the offense. The series of deceitful acts undertaken to attain the loans constitute a pattern of corrupt activity. And the fact that these transactions occurred on different dates and locations demonstrates the longevity of the enterprise. Therefore, there was sufficient evidence to sustain Sultaana's conviction for engaging in a pattern of corrupt activity.

{¶31} The first assignment of error is overruled.

## 2. Tampering With Records

{¶32} In the second assignment of error, Sultaana argues there was insufficient evidence to sustain his tampering with records convictions because those charges were erroneously charged under R.C. 2913.42 instead of R.C. 4505.19, which prohibits the use of falsified titles and certificates of title to secure goods, services, credit, and money.

{¶33} Sultaana was convicted of 28 counts of tampering with records, in violation of R.C. 2913.42(A)(1). He contends that, pursuant to R.C. 1.51, he should have been charged with

violating R.C. 4505.19(A)(4) because it is a more specific provision than R.C. 2913.42(A)(1). R.C. 4505.99 provides that a violation of R.C. 4505.19(A)(4) is a misdemeanor. Sultaana's tampering with records convictions for falsifying government records under R.C. 2913.42(A)(1) and 2913.42(B)(4) are third-degree felonies.

{¶34} R.C. 1.51 states:

If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail.

{¶35} A tampering with records offense under R.C. 2913.42 does not conflict with R.C. 4505.19(A)(4). R.C. 4505.19(A)(4) prohibits one from using fictitious, forged, or counterfeit certificates of auto titles to obtain goods, credit, or money, i.e., loans. R.C. 2913.42(A)(1) provides that "[n]o person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall * * * (f)alsify, * * * alter, deface, or mutilate any writing, * * *or record." R.C. 2913.42(B)(4) provides that if the tampered record or writing "is kept by or belongs to a local, state, or federal governmental entity," then the tampering with records offense is "a felony of the third[-]degree." The fact that Sultaana falsified certificates of title kept by the Ohio BMV is only relevant when determining the level of the offense.

{¶36} Furthermore, R.C. 2913.42(A)(1) prohibits the act of falsifying records whereas R.C. 4505.19(A) prohibits the use of falsified records to obtain goods, credit, or money. Thus, a defendant may be guilty of using a falsified record to perpetrate a fraud without actually

falsifying the record, and another defendant could be guilty of falsifying government records without obtaining goods, credit, or money. Because the offenses involve the commission of separate and distinct acts not required of the other, the two provisions are reconcilable and do not conflict. Indeed, R.C. 2941.25, which requires the merger of allied offenses of similar import, exists because sometimes multiple offenses can be committed by the same conduct. Therefore, Sultaana was lawfully charged with and convicted of tampering with records in violation of R.C. 2913.42(A)(1) and 2913.42(B)(4).

**{¶37}** The second assignment of error is overruled.

### B. Allied Offenses

**{¶38}** In the third assignment of error, Sultaana argues the trial court erred in failing to merge his securing writings by deception convictions with his grand theft conviction. He contends the grand theft offense incorporates the totality of the theft offenses charged in the indictment.

**{¶39}** "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, which prohibits multiple punishments for the same offense." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 23. Under R.C. 2941.25(A), when the same conduct by the defendant "can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." However, R.C. 2941.25(B) provides

Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the

indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶40}** The Ohio Supreme Court set forth the test courts should employ when deciding whether two or more offenses are allied offenses that merge into a single conviction under R.C. 2941.25. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 25. In accordance with the court's prior decision in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the *Ruff* court held that an allied offenses analysis begins with an examination of the defendant's conduct. *Ruff* at ¶ 25. However, the court elaborated on the test and held that multiple offenses do not merge if (1) the offenses are dissimilar in import or significance, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation. *Id*. at syllabus. With respect to the first factor, the court explained that two or more offenses are dissimilar within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id*. at syllabus.

**{¶41}** Sultaana was convicted of one count of grand theft as charged in Count 2 of the indictment. Count 2 alleges that Sultaana purposely deprived Integrity Funding, Ace Cash Express, American Honda Finance, Amy Agosti, and James Wallace, of property or money by deception, "and the property * * * stolen is valued at $7,500 or more and less than $150,000." Sultaana was convicted of 22 counts of securing writings by deception as a result of each fraudulently secured loan. Each of the 22 counts of securing writings by deception alleged that Sultaana, by deception, caused either Ace Cash Express or LoanMax to execute a "writing that disposed of or encumbered property, or by which a pecuniary obligation was incurred and the value of the property or obligation involved was $1,000 or more and less than $7,500." The

aggregate of all the theft offenses is equal to the value alleged to have been stolen in the grand theft offense.

{¶42} However, we find that the individual counts of securing writings by deception do not merge with the grand theft count because they were not committed by the same conduct. Each of the securing writings by deception offenses were committed separately on different days, at several different locations. The state suggests that in some cases the value of all theft amounts may be aggregated, and all thefts may be tried as a single offense pursuant to R.C. 2913.61(C)(2), but contends the offenses in this case should not merge for various reasons. However, R.C. 2913.61, which requires the aggregation of multiple theft offenses in some cases, only applies where the defendant committed the theft offenses as a result of an ongoing relationship with the victim, such as an employer-employee relationship. *State v. Mahone*, 10th Dist. Franklin No. 12AP-545, 2014-Ohio-1251, ¶ 64. In *State v. Preztak*, 181 Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254 (8th Dist.), we held that defendant's theft offenses were required to be aggregated under R.C. 2913.61(C)(1) because all of the defendant's thefts occurred while she was in "the same employment with Associated [Estates Realty Corporation], who was the only victim." *Id*. at ¶ 15.

{¶43} Additionally, the legislative comments to R.C. 2913.61(C)(2) indicate the section is intended to address embezzlement-type crimes. The comment explains:

> Under the new code, embezzlement is not defined as a separate offense, but is a series of theft offenses committed by an offender within a given span of time in his same employment, capacity, or relationship to another. An example of this is the truck driver who over a period of a year lifts a few items from various of his cargoes, even though the cargoes may belong or be consigned to different persons. Another example is the social club treasurer who during his term converts dues money to his own use.

**{¶44}** The rationale for the rule is that the prosecution should not be required to separately "allege and prove each offense in the series, since in the usual embezzlement case this would be extremely difficult."  1974 Committee Comment to H.B. 511.  In embezzlement-type cases, the prosecution need only "allege and prove * * * that the offender committed one or more theft offenses within a given period, while standing in the same employment, capacity, or relationship to another."  *Id.*

**{¶45}** Sultaana had no legitimate ongoing relationship with the loan companies.  Thus, the securing writings by deception offense alleged in Count 47 is the only count that could arguably merge with the grand theft offense alleged in Count 2 because they both involve property loss "valued at $7,500 or more and less than $150,000," and they were committed in a single transaction.

**{¶46}** However, some of the victims of the grand theft offense were not victims of the securing writings by deception offenses.  In addition to the loan companies, Amy Agosti and James Wallace were victims of the grand theft.[3] Thus, the offenses are dissimilar because they involve different victims.  *Ruff*, 143 Ohio St. 3d 114, 2015-Ohio-995, 34 N.E.3d 892, at ¶ 26.

**{¶47}** Moreover, *Ruff* instructs us to examine not only the defendant's conduct or actions, but also his animus, and whether the offenses caused separate identifiable harm.  In this case, the evidence showed that in each act of securing writings by deception, Sultaana intended to deceive the loan companies as well as each of the individual codefendants who participated in those

---

[3] Agosti gave Sultaana $1,050 and a Blazer in exchange for a vehicle that Sultaana never delivered, and Sultaana never returned the Blazer or the $1,050. Similarly, Wallace paid Sultaana $1,400 to purchase a van, and Sultaana never delivered it or repaid the money.  Although Wallace and Agnosti were victims of the grand theft, they were not victims of the securing writings by deception offenses.

offenses. Indeed, the codefendants were simultaneously perpetrators and victims of their own crimes.

{¶48} The fact that Sultaana repeatedly persuaded people to take out loans and give him the money without repaying the loans demonstrates that Sultaana never intended to repay the loans as promised. Sultaana planned on keeping the stolen money for himself and leaving the codefendants in the lurch. His actions evidence an intent to harm both the loan companies and each individual codefendant. Separate victims are sufficient to establish a separate animus for each offense, as each victim has a specific and identifiable right to redress against the conduct of the defendants. *Ruff* at paragraph two of the syllabus ("[T]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the conduct constitutes offenses involving separate victims.").

{¶49} The trial court properly determined that Sultaana's securing writings by deception and grand theft offenses do not merge into a single conviction under R.C. 2941.25(B) because they were committed separately, involve separate victims, and the harm resulting from each offense is separate and identifiable.

{¶50} The third assignment of error is overruled.

### C. Sentence and Right to Trial

{¶51} In the fourth assignment of error, Sultaana argues the trial violated his constitutional rights by imposing a 14-year sentence as punishment for exercising his right to trial.

{¶52} A trial court may not sentence a defendant more severely simply because he exercised his right to trial. *Columbus v. Bee*, 67 Ohio App.2d 65, 425 N.E.2d 404 (10th Dist.1979). The United States Supreme Court has held that a trial court violates the Due Process Clause of the Fourteenth Amendment when the court, motivated by vindictiveness, imposes a harsher sentence than previously discussed prior to trial. *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). A court may not punish an accused for rejecting a plea and electing to proceed to trial. *State v. Shepherd*, 8th Dist. Cuyahoga No. 97962, 2012-Ohio-5415, ¶ 68.

{¶53} However, vindictiveness is not presumed merely because the trial court imposed a stricter sentence than the one offered in plea negotiations. *Id*. In determining whether a court was motivated by vindictiveness to impose a harsher sentence, the record must affirmatively show retaliation as a result of the rejected plea bargain. *Id.*; *see also State v. Warren*, 125 Ohio App.3d 298, 307, 708 N.E.2d 288 (8th Dist.1998). There must be some positive evidence demonstrating a vindictive purpose on the court's part. *Shepherd* at ¶ 68.

{¶54} Here, the trial court explained at sentencing that as a result of hearing witness testimony, "the Court learned more information and discovered the extent of the harm." (Tr. 3503.) The court explained:

> As the case progressed * * * the Court learned the details of more of these facts, the details of how the various victims were scammed, were defrauded, how the process was manipulated, not unlike what was going on in the courtroom, and especially how the State's title system was manipulated and defrauded.

(Tr. 3498.) The court indicated that after hearing witness testimony, it learned how Sultaana

> took advantage of people with those vulnerabilities, he used his emotions with his girlfriends, with women. He used their vulnerabilities with respect to drug addiction, substance abuse. The evidence was clear that he perpetrated these scams in order to get more money for drugs, to keep his girlfriends, his codefendants, his minions doing his bidding * * * .

So that substance abuse contributed to the seriousness of his conduct.

(Tr. 3500.) The court concluded that the codefendants were, themselves, victims. The codefendants not only suffered financial loss, but also acquired felony convictions, in part, as a result of Sultaana's manipulation.

**{¶55}** The trial court recognized that, in addition to the loan companies, innocent citizens such as Amy Agosti and James Wallace were victimized. The court also noted that "[t]his defendant's own family members, Dashara Hughley, his own mother [was] sucked into this scam. It shows a lack of any concern for the rules of society. And this was an organized criminal activity." (Tr. 3500.) Thus, the court explained that it found a more severe sentence was warranted after it learned the scope and magnitude of the harm. (Tr. 3500.)

**{¶56}** The court also discovered more about Sultaana's likelihood for recidivism from the presentence investigation report, which the court lacked during plea negotiations. (Tr.3497.) The court found that Sultaana was known by other aliases, had other social security numbers, and had an extensive criminal history that included prior prison terms.

**{¶57}** It is undisputed that all the sentences were within the statutory range, and the court complied with the requirements of R.C. 2929.14(C) for the imposition of consecutive sentences. The court provided a reasonable explanation for its decision to impose a more severe sentence than the one discussed during plea negotiations. We find nothing in the record to suggest that the court was motivated by vindictiveness.

**{¶58}** Therefore, the fourth assignment of error is overruled.

### III. Conclusion

**{¶59}** There was sufficient evidence to support Sultaana's RICO conviction. The evidence showed that he conspired with two codefendants to induce "outside" codefendants to

commit crimes in furtherance of the conspiracy. The collaboration of these individuals demonstrated the existence of an enterprise, which is a necessary element of Sultaana's RICO conviction.

**{¶60}** Appellant was properly charged with and convicted of tampering with records because R.C. 2913.42, which prohibits tampering with records, does not conflict with R.C. 4505.19, which prohibits the use of falsified certificates of title to secure credit or obtain money.

**{¶61}** The trial court's decision not to merge Sultaana's securing writings by deception convictions with his grand theft conviction was appropriate where the offenses were committed separately, there were separate victims, and there was separate identifiable harm.

**{¶62}** Finally, the trial court did not violate Sultaana's constitutional right to trial by punishing him with a harsher sentence. The trial court explained that it decided a more severe sentence was necessary after learning the scope and magnitude of the harm to the large number of victims.

**{¶63}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

EILEEN T. GALLAGHER, JUDGE

LARRY A. JONES, SR., A.J., and
MELODY J. STEWART, J., CONCUR