[Cite as *State v. Ford*, 2026-Ohio-348.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                                    :

    Plaintiff-Appellee,               :

                              No. 115098

    v.                                          :

BRUCE FORD,                                       :

    Defendant-Appellant.            :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 5, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-679300-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brandon Piteo, and Carley Berman, Assistant Prosecuting Attorneys, *for appellee*.

Christopher M. Kelley, *for appellant*.

LISA B. FORBES, P.J.:

{¶ 1} Bruce Ford ("Ford") appeals his convictions for engaging in pattern of corrupt activity, grand theft, and two counts of fifth-degree felony theft. After thorough review of the law and the facts, we affirm.

## I.   Facts and Procedural History

### A. Before Trial

{¶ 2}   On March 9, 2023, Ford, Tyrone Brooks ("Brooks"), and Lawrence Williams ("Williams") (collectively, "defendants") were named in a 37-count indictment that alleged criminal activity spanning approximately four years.  Ford was charged in Count 1 with engaging in pattern of corrupt activity, a felony in the first degree, in violation of R.C. 2923.32(A)(1).  Ford was also charged with three counts of theft at issue in this appeal.[1]  Counts 27 and 32 alleged, against Ford and Brooks, theft, a felony in the fifth degree, in violation of R.C. 2913.02(A)(1).  Count 30 alleged, against Ford, Brooks, and Williams, grand theft, a felony in the fourth degree, in violation of R.C. 2913.02(A)(1).  Ford was not named in 27 other counts.

### B. Trial Testimony

{¶ 3}   The case proceeded to a jury trial on March 25, 2025.  The State called nearly 50 witnesses, eliciting extensive testimony.  Our summary of the facts is limited in accordance with the charges against Ford and the issues raised on appeal.

#### 1.  Prior Theft Offense

##### a. Detective Shawn Hevener

{¶ 4}   Shawn Hevener ("Det. Hevener") testified that he was a detective for the police department in Austintown, Ohio.  He explained that in another case, initiated before the Mahoning Court of Common Pleas in 2021, Ford and Brooks were alleged to have stolen cigarettes from a delivery truck at a gas station

---

[1] Ford was found not guilty of seven other counts of theft.

("Austintown theft").[2]  Consequent to those allegations, prior to this trial, Ford and Brooks both pled guilty to fifth-degree felony theft.  Journal entries documenting those convictions were admitted into evidence in this case.

{¶ 5}  Det. Hevener obtained surveillance video of the Austintown theft, which was recorded at the gas station.  The video was admitted into evidence in this case.  The video shows a silver Toyota pull into a parking lot alongside a delivery truck.  Two men exit the Toyota, remove multiple boxes from the delivery truck's cargo hold, and drive away.

{¶ 6}  That same day, following a traffic stop, Det. Hevener arrested Brooks and took photos of the car that he was driving.  These photos were admitted into evidence in this case and show a silver Toyota Avalon with a license plate number JGJ 4623.

### 2.  Count 27:  Theft at a Valero Gas Station on June 1, 2022
#### a. Darrell Bralley

{¶ 7}  Darrell Bralley ("Bralley") testified that he was a truck driver and that he made a delivery to a Valero gas station in Cleveland, Ohio, on June 1, 2022.  During this delivery, "two guys stole . . . cigarettes off the back of the truck while I was inside the store."  Bralley later reviewed surveillance videos recorded at the station, which he recognized when played in court.  He identified himself, his truck, and the station in the videos, which are dated June 1, 2022.

---

[2] The Austintown theft was not among the offenses that were charged in this case.

{¶ 8} The videos show a delivery truck pull into a gas station parking lot. Two deliverymen exit the truck and begin unloading its cargo hold. A silver Toyota with a license plate number JGJ 4623 pulls alongside the truck. Eventually, two men exit the Toyota. For several minutes, these men walk around the gas station parking lot, while looking at the truck and talking to one another. Eventually, one man reenters the Toyota through its driver's-side door. The other walks quickly towards the delivery truck, picks up two large boxes from its cargo hold, and runs to the Toyota, which he enters through its passenger door. The Toyota then drives away from the gas station.

{¶ 9} Bralley had been a truck driver for 30 years and, at the time of the theft, delivered cigarettes, candy, and other items to this Valero gas station every week. Bralley knew the value of "some" of the items that he delivered and estimated that each case of cigarettes cost $3,000. He knew that at least two cases had been stolen on June 1, 2022, but did not remember exactly how many.

### a. Detective Nikolai Przybylski

{¶ 10} Nikolai Przybylski ("Det. Przybylski") testified that he helped investigate this case as a detective for the Cleveland Division of Police. He interviewed Bralley and reviewed the surveillance video recorded at the Valero gas station. Det. Przybylski stated that the Austintown theft, to which Ford and Brooks had pled guilty before this trial, occurred in a similar manner to the thefts at issue in this case.

### 3. Count 30: Theft at a Friendship Food Store on September 27, 2022

#### a. Mark Studebaker

{¶ 11} Mark Studebaker ("Studebaker") testified that he was a truck driver and that he made a delivery to a Friendship food store in Norwalk, Ohio, on September 27, 2022. Afterwards, he realized that cigarettes had been missing from the delivery.

{¶ 12} Studebaker reviewed surveillance videos recorded at the store, which he recognized when they were played in court. The videos, dated September 27, 2022, show a silver Toyota pull into a parking lot. Three men exit the car and walk to a location that is off screen. They return carrying three large boxes, which they load into the car before driving away.

{¶ 13} Studebaker did not know the value of a case of cigarettes. He agreed that he provided the police a list of what had been stolen that valued the missing cigarettes at $1,277.93. After doing so, he realized that more cigarettes had been stolen than he first realized, which he told the police. He did not remember the updated value of the missing cigarettes.

#### b. Officer James Montana

{¶ 14} Officer James Montana ("Ofc. Montana") testified that he had been a police officer for the Norwalk Police Department and that, on September 27, 2022, he responded to a reported theft at a Friendship food store.

{¶ 15} Ofc. Montana testified that 114 cartons of cigarettes had been stolen, the value of which he estimated to be $12,000. He determined this value using a list

of missing orders that Studebaker provided him. Ofc. Montana also used a list of prices that a store clerk gave him.

### c. Detective Scott Hamernik

{¶ 16} Scott Hamernik ("Det. Hamernik") testified that he was a detective for the Norwalk Police Department and that he investigated this theft. He spoke to law enforcement officials from other counties and learned of Ford, Brooks, and Williams. He obtained photos from each of their driver's licenses, which were admitted into evidence. Det. Hamernik compared these photos to the surveillance video recorded at the store. Based on this comparison, he opined that Ford, Brooks, and Williams committed the theft at the Friendship food store.

### 4. Count 32: Theft at a Marathon Bell Gas Station on October 17, 2022

### a. Shawn Gromes

{¶ 17} Shawn Gromes testified that he was a truck driver and that he made a delivery to a Marathon Bell gas station in Massillon, Ohio, on October 17, 2022. He began to unload his truck, bringing products into the gas station. "When I came out of the store . . . I [saw] a gentleman in the back of the truck and then a guy to the left of the ramp . . . and the guy inside of the truck was handing cases of cigarettes out to him."

{¶ 18} Gromes yelled at the men and ran towards them. Carrying a case of cigarettes, the two men ran to a "silver Toyota Avalon." Gromes saw "two other full cases of cigarettes" in the Avalon's trunk, "plus the one they were just putting in." The men "slammed the trunk and hopped in and took off."

{¶ 19} Gromes yelled across the parking lot to a police officer who happened to already be at the gas station. Gromes told the officer that the two men had stolen cigarettes from the delivery truck. The officer pursued the Avalon.

{¶ 20} Gromes "and the store manager went through all of the cigarettes that were delivered and then what they were missing . . .[and] got the price for each carton." They calculated the value of the stolen cigarettes to be $6,879.10. According to Gromes, a case of cigarettes contained 30 cartons, and a carton of cigarettes cost $70-120.

### b. Officer Jason Smith

{¶ 21} Jason Smith ("Ofc. Smith") testified that he was a patrolman for the City of Massillon. He was on duty at the Marathon Bell gas station on October 17, 2022, when he heard Gromes yelling and observed two men loading cigarettes into the trunk of a silver Toyota Avalon. Ofc. Smith identified Ford and Brooks in the courtroom as the two men that he had observed.

{¶ 22} The men drove away in the Avalon, and Ofc. Smith pursued in his police car. He pulled the Avalon over and arrested both men, who he learned were Ford and Brooks. Ofc. Smith recovered from the Avalon "three cardboard boxes which in grand total are 90 cartons all together." Body-camera and dash-camera footage of the arrest was admitted into evidence, which shows cases of cigarettes in the car.

### 5. Additional Investigation

#### a. Detective Matthew Nycz

{¶ 23} Matthew Nycz ("Det. Nycz") testified that he had been a detective for the Cleveland Division of Police and that he helped investigate this case. Prior to Ford and Brooks's arrest, he obtained a search warrant for the Toyota Avalon, which he executed. The car was not titled to Ford, Brooks, or Williams.

{¶ 24} From the Avalon, Det. Nycz recovered three documents with Ford's name on them. The documents linked Ford to a Knuth Avenue address, though Det. Nycz found the car on Milverton Road. Among the documents was a traffic citation issued to Ford, concerning a Toyota with a license plate number JGJ 4623. Det. Nycz acknowledged that there were other documents in the car that he did not collect and that may have been associated with individuals other than Ford.

{¶ 25} Also from the Avalon, Det. Nycz recovered a jacket, cell phone, water bottle, deodorant, and cigarillos. No DNA link was established between these items and Ford.

#### b. Detective Linda Castro-Tulevski

{¶ 26} Linda Castro-Tulevski ("Det. Castro-Tulevski") testified that she was a detective for the Solon police department. She helped investigate this case, examining three phones ("Phones 1, 2, and 3," respectively). Phones 1 and 2 were associated with Brooks, and Phone 3 with Ford. Det. Castro-Tulevski determined that Phone 1 belonged to Brooks because he identified himself by name in chats and

because she found an email address that included his name in the phone's "user section."  In the same manner, she determined that Phone 3 belonged to Ford.

{¶ 27} Det. Castro-Tulevski analyzed over seven months of data taken from Phone 3.  The only interaction that she identified between Phones 1 and 3 was a message that concerned meat.[3]

### C. Verdict, Sentencing, and this Appeal

{¶ 28} The jury found Ford guilty of engaging in pattern of corrupt activity, as alleged in Count 1, and of the thefts alleged in Counts 27, 30, and 32.

{¶ 29} On April 21, 2025, the court held a sentencing hearing.  Regarding his conviction for engaging in pattern of corrupt activity, the court imposed on Ford a prison term of three to four and one-half-years, under the Reagan Tokes Law.  The trial court ordered Ford to serve this sentence concurrently to prison terms of twelve months for each of his three theft convictions, for a total prison term of three to four and one-half years.

{¶ 30} Ford appealed, raising the following assignments of error:

> 1. Appellant's conviction of engaging in a pattern of corrupt activity was not supported by sufficient evidence.
>
> 2. Appellant's convictions were against the manifest weight of the evidence.

---

[3] Several counts in the indictment alleged that meat was among items that Brooks stole.  Ford was not named in these counts.

## II.  Law and Analysis

### A. Ford's Conviction for Engaging in Pattern of Corrupt Activity Was Supported by Sufficient Evidence

{¶ 31} In his first assignment of error, Ford asserts that insufficient evidence supported his conviction for engaging in pattern of corrupt activity.  Ford argues that he and Brooks were not part of an enterprise because he stole only cigarettes, while Brooks stole other items.  Ford further notes that Brooks was alleged to have committed thefts without Ford.

{¶ 32} "A claim of insufficient evidence raises the question whether the evidence is legally sufficient to support the verdict as a matter of law." *State v. Parker*, 2022-Ohio-1237, ¶ 7 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  The relevant inquiry in a sufficiency challenge is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime existed beyond a reasonable doubt.  *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  When making a sufficiency determination, an appellate court does not review whether the prosecution's evidence is to be believed but whether, if believed, the evidence admitted at trial supports the conviction.  *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins* at 386.

{¶ 33} R.C. 2923.32(A)(1) establishes the elements of engaging in pattern of corrupt activity, stating that "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity . . . ."  To prove a violation of the

statute, the State must show that: "(1) the defendant committed two or more predicate offenses, (2) the defendant was 'employed by, or associated with' an 'enterprise,' and (3) the defendant conducted or participated in the enterprise 'through a pattern of corrupt activity.'" *State v. Sultaana*, 2016-Ohio-199, ¶ 17 (8th Dist.), citing *State. v. Miranda*, 2014-Ohio-451, ¶ 13.

{¶ 34} Predicate offenses for engaging in pattern of corrupt activity are listed in R.C. 2923.31(I)(2)(c). These offenses include "[a]ny violation of section . . . 2913.02 . . . of the Revised Code," which is Ohio's theft statute. Notably, though, the conduct required to convict a defendant for engaging in pattern of corrupt activity is independent of the conduct required to convict him for the predicate acts. *Sultaana* at ¶ 17, citing *Miranda* at ¶ 13. R.C. 2923.32(A)(1) seeks to criminalize the *pattern* of criminal activity, not the underlying conduct. (Emphasis added.) *Id.*, citing *id.*

{¶ 35} Regarding the "pattern" element of this offense, R.C. 2923.31(E) defines "[p]attern of corrupt activity" to mean "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." The Ohio Supreme Court has also stated that a pattern must include "continuous activity." *Miranda* at ¶ 13.

{¶ 36} Concerning the "enterprise" element of this offense, the Ohio Supreme Court has stated that "[t]he existence of an enterprise . . . can be established

without proving that the enterprise is a structure separate and distinct from a pattern of corrupt activity." *State v. Beverly*, 2015-Ohio-219, ¶ 13. This is because "[n]othing in R.C. Chapter 2923 implies or explicitly states that an enterprise and a pattern of corrupt activity must be proved with separate evidence." *Id.* at ¶ 8.

{¶ 37} In *Beverly*, the Court also noted that "the existence of an enterprise is more difficult to establish" where it is an association-in-fact, or a group of persons functioning with a common purpose, as opposed to, for example, an illicit corporate entity. *Id.* at ¶ 9. The Ohio Supreme Court has found an association-in-fact enterprise existed based on "the following features: 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *State v. Dent*, 2020-Ohio-6670, ¶ 19, quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009).

{¶ 38} First, we find that Ford was convicted of at least two predicate offenses — specifically, three counts of theft — as required for a conviction of engaging in pattern of criminal activity. Discussed later in this opinion, we do not find Ford's three theft convictions to be against the manifest weight of the evidence.

{¶ 39} We also find that the State introduced sufficient evidence that Ford's conduct amounted to a pattern of corrupt activity, under R.C. 2923.31(I)(2)(c). Ford does not dispute that he stole cigarettes, contesting only the value of the stolen cigarettes. Video evidence related to all three counts captured men, later identified by multiple witnesses as defendants, driving a silver Toyota away from retail locations with boxes of cigarettes. As to Count 32, Ofc. Smith arrested Ford and

Brooks after following them from the scene, having watched them load boxes of cigarettes into the Avalon.

{¶ 40} The evidence presented at trial demonstrated that these thefts were not so closely related and connected in time and place as to constitute a single event. The thefts occurred at different stores in Cleveland, Norwalk, and Massillon, Ohio, in June, September, and October of 2022, respectively. Nonetheless, these thefts were not isolated incidents and demonstrate continuous activity. In all three instances, over a period of less than five months, at least Ford and Brooks drove together to a store and stole cases of cigarettes from the cargo hold of a truck.

{¶ 41} We also find that the evidence presented at trial demonstrated that Ford and Brooks effectuated each theft as part of an enterprise, shown here, as in *Dent*, by purpose, relationships, and longevity. The thefts shared a common purpose — to steal cigarettes. We acknowledge that Brooks was alleged to have stolen other items, including meat, without Ford. However, we find no evidence that Brooks stole anything other than cigarettes during the three thefts at issue here, nor did the State allege that he did so. To the extent that Brooks stole other items without Ford, we do not find that doing so affected the purpose behind the actions that he undertook with Ford.

{¶ 42} The record also shows a relationship between Ford and Brooks. The men traveled to and/or from each theft together in the same vehicle. In surveillance video, they walked together and appear to speak to one another. Further, we find that under these circumstances, the enterprise existed for sufficient time to pursue

its purpose — again, Ford and Brooks stole cigarettes three times in less than five months.

{¶ 43} For these reasons, we find that Ford's conviction for engaging in pattern of corrupt activity was supported by sufficient evidence. Accordingly, assignment of error No. 1 is overruled.

## B. Ford's Convictions Were Not Against the Manifest Weight of the Evidence

{¶ 44} In his second assignment of error, Ford asserts that his convictions were against the manifest weight of the evidence. A manifest-weight-of-the-evidence challenge "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386-387. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the Ohio Supreme Court recently explained that "[the] court looks at the entire record and "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"" *State v. Brown*, 2025-Ohio-2804, ¶ 30, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 45} At trial, the jury is in the "best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony." *State v.*

*Sheline*, 2019-Ohio-528, ¶ 100 (8th Dist.). Reversal on manifest-weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

### 1. Engaging in Pattern of Corrupt Activity

{¶ 46} Regarding his engaging-in-pattern-of-corrupt-activity conviction, Ford raises arguments regarding the silver Toyota Avalon and his phone records. Ford argues that the evidence linking him to the Toyota Avalon "was suspect." He points out that the car was not titled to him, contained documents that did not name him, and was searched at an address with which he was not associated. Nonetheless, surveillance video showed that Ford arrived at and departed from each theft in a silver Toyota. Further, in surveillance video of the theft at the Valero gas station, a license plate with the number JGJ 4623 is affixed to the car. Det. Nycz testified that this license plate number was also associated with the traffic citation that had been issued to Ford and that was found in the Toyota. That same license plate number was also visible in photographs that Det. Hevener took while arresting Brooks for the Austintown theft, to which Ford pled guilty before this trial. Ford was also traveling in a silver Toyota Avalon when Ofc. Smith arrested him on October 17, 2022.

{¶ 47} Next, Ford argues that, had he and Brooks been part of an enterprise, their phone records would show more interaction between them. Ford points out that the State identified only one conversation between the phones it associated with Ford and Brooks. We are not persuaded by this argument. Nothing in the record

precludes a finding that Ford and Brooks communicated by means other than the phones that Det. Castro-Tulevski analyzed. In fact, surveillance videos show the men appearing to speak face-to-face during at least one of the thefts at issue. Further, whether by car or on foot, the men travel side-by-side in video related to all three thefts, each of which occurred in a manner similar to the other thefts.

{¶ 48} Given the foregoing, we do not find that this is an exceptional case in which the evidence weighs heavily against conviction. Ford's conviction for engaging in pattern of corrupt activity was not against the manifest weight of the evidence.

### 2. Theft

{¶ 49} Ford also asserts that the manifest weight of the evidence does not support his convictions for theft. Regarding each theft conviction, Ford argues that the State failed to present credible evidence as to the value of the stolen cigarettes. According to Ford, the State failed to demonstrate that the witnesses who estimated the value of the cigarettes were qualified to do so.

{¶ 50} Establishing the elements of theft, R.C. 2913.02 prohibits a person, "with purpose to deprive the owner of property," from "knowingly obtain[ing] or exert[ing] control over" the property," in several ways, including "without consent of the owner or person authorized to give consent . . . ." R.C. 2913.02(A), (A)(1).

{¶ 51} Thefts are classified according to the value of the property that was stolen. Under R.C. 2913.02(A)(2), theft of property valued at "one thousand dollars or more" but "less than seven thousand five hundred dollars" is a fifth-degree felony.

Theft of property valued at "seven thousand five hundred dollars or more" but "less than one hundred fifty thousand dollars" is grand theft, a fourth-degree felony. R.C. 2913.02(A)(2). "Pursuant to R.C. 2913.61(D), [these] amount[s] may be set by 'the[ir] fair market value.'" *State v. Klepatzki*, 2009-Ohio-3288, ¶ 18 (8th Dist.), quoting *State v. Collins*, 2006-Ohio-4898 (8th Dist.).

{¶ 52} We do not find that the manifest weight of the evidence was against Ford's theft convictions. In support of each theft allegation, the State called at least one witness who testified that the stolen cigarettes' values met or exceeded the amount alleged. Ford has identified no substantial inconsistencies between the witness's estimates of the per-case or per-carton value of cigarettes. Ford introduced no evidence in response to the State's evidence as to the value of cigarettes.

{¶ 53} Contrary to Ford's assertions, the State's witnesses explained their knowledge of the value of cigarettes and how they determined the value of what had been stolen. Regarding Count 27, Bralley testified that he had been a truck driver for more than 30 years and delivered to the Valero gas station every week. He knew the value of at least some of the items that he delivered, including cigarettes, which he testified cost $3,000 per case. On this basis, he estimated the value of the two cases of cigarettes he discovered were missing from his truck to be $6,000.

{¶ 54} Concerning Count 30, Ofc. Montana testified that he received a list of missing orders from Studebaker and associated prices from a store clerk. From this

information, Ofc. Montana estimated the value of the stolen cigarettes to be $12,000.

{¶ 55} As to Count 32, Gromes testified that he "and the store manager went through all of the cigarettes that were delivered and then what they were missing . . . [and] got the price for each carton." From this information, they calculated the value of the stolen cigarettes to be $6,879.10. This is consistent with the roughly $6,300 minimum value implied by Ofc. Montana's testimony that he recovered 90 cartons of cigarettes from the Avalon, each of which, according to Gromes, cost at least $70.

{¶ 56} Further, concerning each theft, the estimated value of the stolen cigarettes significantly exceeded the amount required to convict Ford for the alleged offense. Regarding both Counts 27 and 32, the State's witnesses estimated the value of the stolen cigarettes to be in the $6,000 range — at least $5,000 greater than the $1,000 threshold that R.C. 2913.02(A)(2) provides for conviction of fifth-degree felony theft. As to Count 30, Ofc. Montana estimated the value of the stolen cigarettes to be $12,000, which exceeds by more than $4,000 the minimum value of $7,500 required for a fourth-degree felony grand theft conviction under R.C. 2913.02(A)(2).

{¶ 57} Given the foregoing, we do not find that this is an exceptional case in which the evidence weighed heavily against conviction nor that any of Ford's three theft convictions were against the manifest weight of the evidence.

{¶ 58} Accordingly, assignment of error No. 2 is overruled.

{¶ 59} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
DEENA R. CALABRESE, J., CONCUR