[Cite as *State v. Yavorcik*, 2018-Ohio-1824.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 104465**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MARTIN YAVORCIK

DEFENDANT-APPELLANT

**JUDGMENT:**
VACATED AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-585428-C

**BEFORE:** Laster Mays, J., Keough, P.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** May 10, 2018

**ATTORNEY FOR APPELLANT**

David L. Doughten
David L. Doughten Co. L.P.A.
4403 St. Clair Avenue
Cleveland, Ohio 44103


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By:    Matthew E. Meyer
Assistant County Prosecutor
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

Mike DeWine
Ohio Attorney General

By:    Daniel M. Kasaris
Senior Assistant Ohio Attorney General
615 Superior Avenue, 11th Floor
Cleveland, Ohio 44113

ANITA LASTER MAYS, J.:

**{¶1}** Defendant-appellant/cross-appellee Martin Yavorcik ("Yavorcik") appeals his convictions for one count of engaging in a pattern of corrupt activity, one count of criminal conspiracy, three counts of bribery, one count of tampering with evidence, and two counts of money laundering. The state, plaintiff-appellee/cross-appellant, cross-appeals the trial court's failure to impose a prison term for the first-degree felony conviction. We find that Yavorcik's challenge on the issue of venue has merit and vacate the conviction.

## I.    Background and Facts

**{¶2}** The case arises from activities that took place in the city of Youngstown, located in Mahoning County, Ohio, between 2005 and 2009. On May 14, 2014, a 73-count indictment was handed down against Mahoning County Commissioner John McNally ("McNally"),[1] Mahoning County Auditor Michael Sciortino ("Sciortino"), and 2008 county prosecutorial candidate Yavorcik. The charges included engaging in a pattern of corrupt activity (R.C. 2923.32(A)(1)) and conspiracy to engage in a pattern of corrupt activity (R.C. 2923.01).

**{¶3}** Unindicted individuals who were allegedly part of the criminal enterprise underlying these charges include several prominent Youngstown area business men and

---

[1]    Titles refer to the capacities held by the individual during the 2005 to 2009 time period.

women, Cuyahoga County law firms and attorneys, and the following Mahoning County officials and employees:

John Reardon ("Reardon"), County Treasurer to 2007

Lisa Antonini ("Antonini"), County Treasurer succeeding Reardon in 2007

John Zachariah ("Zachariah"), Director of Mahoning County Department of Jobs and Family Services ("JFS").

**{¶4}** The defendants entered not guilty pleas. Multiple counts were dismissed prior to trial. Sciortino and McNally accepted plea agreements the morning of trial. Yavorcik, a licensed Ohio attorney, proceeded pro se during the two-week jury trial that involved 26 witnesses and numerous exhibits. The trial began on March 14, 2016, and the verdict was rendered on March 25, 2016. Yavorcik was found guilty of:

| Count 1: | January 1, 2005 to January 1, 2009 — engaging in a pattern of corrupt activity, R.C. 2923.32(A)(1) conspiracy, a first-degree felony; |
|---|---|
| Count 3: | January 1, 2005 to February 1, 2014[2] — conspiracy, R.C. 2923.01(A)(2), a second-degree felony; |
| Count 8: | March 1, 2008 to November 30, 2008 — bribery, R.C. 2921.02(B), a third-degree felony; |
| Count 9: | March 1, 2008 to November 30, 2008 — bribery, R.C. 2921.02(B), a third-degree felony (Yavorcik only) |
| Count 10: | March 1, 2008 to November 30, 2008 — bribery, R.C. 2921.02(B), a third-degree felony (Yavorcik only) |

---

[2] It appears that, based on the jury instructions, the proper time period for this count of the amended indictment is also 2005 to 2009.

Count 11: October 23, 2008 — tampering with records, R.C. 2913.42(A)(1), a third-degree felony (Yavorcik only)

Count 53: March 20, 2008 — money laundering, R.C. 1315.55(A)(2) (Yavorcik only)

Count 54: September 1, 2008 to September 30, 2008 — money laundering, R.C. 1315.55(A)(2) (Yavorcik only)

{¶5} The state alleges that a pattern of corrupt activity is demonstrated by two conspiracies. The first conspiracy is commonly referred to as the Oakhill Renaissance conspiracy. The second conspiracy is based on Yavorcik's 2008 prosecutorial campaign.

### A. Oakhill Renaissance

{¶6} In 1987, JFS leased 96,000 square feet of space in McGuffy Plaza ("McGuffy Plaza") for $400,000 per year. McGuffy Plaza was owned by Ohio Valley Mall ("OVM"), a subsidiary of the Youngstown-based Cafaro Company ("Cafaro Co.").

{¶7} Cafaro Co., founded, owned, and operated by the Cafaro family, operates through a number of subsidiaries and affiliates. Cafaro Co. is one of the largest privately owned retail business development and management companies in the United States. The Cafaro family members relevant to this case are Anthony Cafaro, Sr. ("Cafaro, Sr."), his brother John J. Carfaro ("J.J. Cafaro") and sister Flora Cafaro ("F. Cafaro").

{¶8} In 2004, Oakhill Renaissance Place ("Oakhill Renaissance"), a commercial building owned by the Southside Community Development Corporation ("SCDC"), was experiencing fiscal difficulty. The Southside Medical Center hospital and several

county departments were already located at the building. The SCDC offered to donate the building to the county.

{¶9} The county refused the offer due to: (1) excessive expenses associated with the hospital operations, (2) extensive repairs were needed, and (3) the building was encumbered by a $440,000 Ohio Department of Development ("ODOD") loan balance, and $400,000 in back taxes. (Tr. 1773-1774.) In 2005, Cafaro Co. rejected SCDC's offer to sell them the property. SCDC filed for bankruptcy in May 2006 and the hospital vacated the building.

{¶10} Without the added expense of the hospital, the county considered purchasing Oakhill Renaissance out of bankruptcy and relocating JFS to the building. According to the state, Cafaro Sr. wanted to prevent the purchase and relocation. Though McGuffy Plaza was in great need of repair, the county was obligated to pay for the repairs under the lease. OVM hired law firms located in Cuyahoga County ("Cuyahoga Firms") to provide legal advice regarding the Oakhill Renaissance bankruptcy.

{¶11} Mahoning County Commissioners Anthony Traficanti ("Traficanti") and David Ludt ("Ludt") supported the purchase and relocation of JFS to Oakhill Renaissance. McNally, Sciortino, Reardon, and Reardon's successor Antonini were against the move due to the cost of assuming the ODOD lien, remediation expenses relating to the presence of lead and asbestos, the expense of operating a building with

thermal heat, and the history of negative cash flow. The opponents generally referred to the facility as a money pit. (Tr. 1316, 1353, and 1598.)

{¶12} McNally, Reardon, and Sciortino requested that county prosecutor Paul Gains ("Gains"), who represented the county's interests as well as those of the county officials, appoint outside counsel pursuant to R.C. 305.14[3] to assist them with filing objections to the purchase of Oakhill Renaissance from the bankruptcy estate. Gains denied the request and the officials filed suit requesting outside counsel. The denial was ultimately appealed to the court of appeals that ruled against them more than a year after the bankruptcy matter was over and ownership had transferred to the county. (Tr. 1536.)

{¶13} Denied counsel, McNally and Sciortino, licensed attorneys who lacked bankruptcy law experience, filed pro se objections along with Reardon. Gains filed a motion to strike the objections that was granted by the trial court for lack of standing. Some of the information furnished by the Cuyahoga Firms to OVM was also shared with McNally and Sciortino to assist them with preparing their bankruptcy case objections. The state alleges that the sharing of this information constituted bribery of the public officials by the Cafaros to influence the county's Oakhill Renaissance purchase decision.

---

[3] R.C. 305.14 provides that, upon application of the prosecuting attorney and the board of county commissions, the court of common pleas may authorize "the board to employ legal counsel to assist the prosecuting attorney, the board, or any other county officer in any matter of public business coming before such board or officer, and in the prosecution or defense of any action or proceeding in which such board or officer is a party or has an interest, in its official capacity." Generally, where a prosecuting attorney has a conflict of interest, the prosecutor's approval is not required in addition to that of the county commissioners. *State ex rel. Hamilton Cty. Bd. of Commrs. v. Hamilton Cty. Court of Common Pleas*, 126 Ohio St.3d 111, 2010-Ohio-2467, 931 N.E.2d 98.

{¶14} On July 27, 2006, the bankruptcy court approved the county's offer to purchase Oakhill Renaissance. Traficanti and Ludt voted to confirm. McNally dissented. McNally, Sciortino, and Reardon appealed the bankruptcy order approving the sale, and the Cuyahoga Firms again provided advisory assistance. The appeal was withdrawn shortly after filing.

{¶15} On August 7, 2006, OVM filed a taxpayer's suit against the county under R.C. 309.13,[4] the board of commissioners, Sciortino, Reardon, and several county officials including Gains in his capacity as prosecutor. The suit requested rescission of the Oakhill Renaissance purchase. On August 15, 2006, OVM filed suit against the county for breach of the McGuffy Plaza lease agreement. The Cuyahoga Firms represented OVM in both lawsuits as well as during OVM's attempt to intervene in a mandamus action initiated by the county against Reardon and Sciortino. (Tr. 1309.)

{¶16} Gains represented the county in the breach of lease and the taxpayers suit.[5] The county filed a motion to dismiss on the ground that OVM, as the JFS lessor, had a personal financial interest in the case and therefore, was not a proper representative of county taxpayers in the suit. (Tr. 1802-1803.)

{¶17} According to assistant county prosecutor Linette Stratford ("Stratford"),

---

[4] R.C. 309.13 allows a taxpayer to institute a civil action where a county prosecuting attorney fails to bring a suit for the benefit of the county as if brought by the prosecuting attorney under stated circumstances involving the protection of public funds under R.C. 309.12.

[5] We reiterate that Gains represented the county though he was a named defendant in his official capacity as prosecutor in the taxpayer lawsuit.

OVM refused to respond to the first set of interrogatories and request for production of documents. The county contacted the OVM attorneys of record, the Cuyahoga Firms, and received a 31-page response that included a copy of a February 2, 2006 note "reflecting a telephone conversation between" Carfaro, Sr. and "Zachariah" requesting to "get together with" McNally to "strategize." (Tr. 1839.)

{¶18} The county obtained authority from the board of commissioners and the court of common pleas to appoint outside counsel in the taxpayers case for McNally, administrator Harry Tablack, Sciortino, Zachariah, and Antonini who assumed the office of treasurer in February 2007. The county served discovery regarding communications between OVM, the Cafaros, and county officials including McNally, Sciortino, Reardon, Zachariah, and Antonini due to concerns raised by attorney-client privilege claims in the discovery responses. The asserted ground for the privilege was that "OVM and their lawyers" "had a common interest" with the public officials named in the county's discovery request. (Tr. 1842.) Stratford explained that "[w]e couldn't understand how" attorneys were communicating "with our clients and us not knowing about it." (Tr. 1843.)

{¶19} The trial judge ordered the production of responsive information for in camera inspection, as well as requested communications between Carfaro, Sr., J.J. Carfaro, Cafaro Co. in-house counsel James Dobran ("Dobran"), Cafaro Co. representatives, and the Cuyahoga Firms. The information was to be accompanied by an explanation of the legal grounds for the privilege claim.

**{¶20}** In March 2007, the trial court issued an opinion addressing the privilege issue, and outlined the documents that were produced for in camera review. The outline was detailed enough to let the county know which items were produced and which were not.

**{¶21}** The information that was not subject to privilege was delivered to the county. Also discovered were handwritten notes regarding meetings referenced in the previously produced information to discuss Oakhill Renaissance. According to the county, Cafaro, Sr., McNally, Zachariah, and Sciortino could not recall certain meetings or communications or denied they occurred.

**{¶22}** While the trial court deemed OVM to be a proper party to pursue the taxpayers suit, the trial court later ruled against OVM on the merits and the case was appealed. OVM dismissed the appeal in October 2007. The breach of the McGuffy Plaza lease agreement suit was settled at approximately the same time. (Tr. 1906.) The billing records of the Cuyahoga Firms confirm that the matters concluded in early October 2007.

**{¶23}** On October 31, 2007, based on information received during discovery in the taxpayer's suit, Gains sent a letter to the Ohio Ethics Commission ("OEC"), reciting deposition excerpts and referencing a number of accompanying documents[6] obtained from the taxpayers suit discovery. Gains suggested that the evidence supported an investigation of McNally, Reardon, Antonini, and Sciortino.

---

[6] The documents are not attached to the letter exhibit entered into the record.

{¶24} Concurrently, the county sheriff was conducting an investigation into the activities of the alleged enterprise members and the Federal Bureau of Investigation ("FBI") was investigating suspected corruption in Trumbull and Mahoning counties. The organizations joined forces in furtherance of the investigations, ultimately resulting in a number of indictments, including those in the instant case.

### B. Prosecutorial Campaign

{¶25} At the end of 2007, Yavorcik decided to run for county prosecutor against Gains. Yavorcik, a long time Democrat, ran as an Independent. The state offers this fact as support for the theory that Yavorcik's campaign, supported by a number of Democrats, was motivated by an illegal agreement with the Oakhill Renaissance enterprise members to quash the ethics investigations and criminal indictments if Yavorcik was elected. Thus, Yavorcik also became a target of the agency investigations.

{¶26} Yavorcik was not shy about sharing his belief that Gains's role in investigating and prosecuting his own clients, the county officials who were actually represented by the office of the prosecutor, was unethical. He also held the opinion that, based on what he had heard and read, the activities that took place regarding Oakhill Renaissance were not illegal.

{¶27} According to the record, there was no love lost between Yavorcik and Gains. In fact, Gains had a number of political antagonists including members of the

Cafaro family and those ultimately indicted as a result of the Oakhill Renaissance investigations.

{¶28} Yavorcik's political run was unsuccessful and concluded in November 2008. However, his involvement with the alleged enterprise members resulted in the instant case. Yavorcik is accused of being a member of the criminal enterprise who acted "with purpose to commit or promote or facilitate the commission of Engaging in a Pattern of Corrupt Activity" by conspiring to conceal or cover-up the investigation and charges arising from the Oakhill Renaissance conspiracy by accepting campaign contributions as bribes, and omitting or misclassifying information in campaign financial reports. Amended indictment, pg. 21.

{¶29} Yavorcik's three bribery convictions were for violations of R.C. 2921.02(B) between March 1, 2008 and November 4, 2008, alleging that he:

Count 8: knowingly solicited or accepted money, services to corrupt or improperly influence him regarding the discharge of his official duty "either before or after" being elected or sworn in;

Count 9: knowingly solicited or accepted a $2,500 campaign contribution from Antonini to corrupt or improperly influence him regarding the discharge of his official duty "either before or after" being elected or sworn in;

Count 10: knowingly solicited or accepted a $2,500 campaign contribution from Antonini to corrupt or improperly influence him regarding the discharge of his official duty "either before or after" being elected or sworn in.

Amended indictment, pg. 22.

{¶30} The jury also found Yavorcik guilty of tampering with records on

October 23, 2008, by filing an inaccurate 2008 pre-election campaign report. The tampering charge stems from the failure to properly list $15,000 received from F. Cafaro to be used for a poll to determine Yavorcik's potential election success. Yavorcik deposited the check into his personal account and issued a $15,000 check for the poll. The poll was listed on the report as an in-kind contribution from Yavorcik. (Tr. 2297.)

{¶31} In addition to multiple witnesses, portions of audio and video recordings were provided by FBI informant and public relations person Harry Strabala ("Strabala"). FBI agent Wally Sines ("Sines") introduced himself to Strabala in 2002 or 2003 and asked him to be a "listening post" for "issues of public corruption." (Tr. 1004.) In 2005, Strabala became a paid FBI informant and recorded conversations with various public officials and others, some of whom are alleged to be part of the enterprise in this case.

{¶32} Yavorcik sought Strabala's professional assistance with his prosecutorial campaign and was first recorded on February 28, 2008, the day that he filed his intention to run for office. Strabala was instructed by the FBI to "create conversation" with Yavorcik so that he would "be critical" of Gains and to "try to align" himself with Yavorcik so that Yavorcik "would feel open enough" to discuss matters freely. (Tr. 1013.)

{¶33} Strabala identified the participants in select excerpts of the FBI surveillance recordings. The technical evidence involved various conversations conducted at functions, restaurants, and meetings. The content introduced for the record focused on

Antonini, McNally, Reardon, and others supporting Yavorcik's campaign. Yavorcik publicly and freely acknowledged while seeking petition signatures that he was a long-time Democrat running as an Independent against the Democratic incumbent, Gains.

{¶34} According to the amended indictment, disbarred attorney Richard Goldberg, a friend of Carfaro, Sr., was "involved with recruiting Yavorcik to run against Gains." Amended Indictment, pg. 4. FBI agent Dean Hassman ("Agent Hassman") testified that Yavorcik, who already knew Goldberg, asked Goldberg to approach Cafaro, Sr. to seek campaign support. Yavorcik ultimately met with Cafaro, Sr. in person to seek support. Cafaro, Sr. informed him that the campaign funds would not be available until the campaign finance report deadline so that the contribution "would not be reflected until after the campaign was over." (Tr. 2271.)

{¶35} Yavorcik asked Strabala early in the campaign planning how a "527 PAC"[7] works, a question that followed Yavorcik's expression of concern about the possible public political impact of accepting money from the Cafaros. Strabala advised that a "527 PAC" allows contributions without identifying who contributed or how much. Strabala explained that 527 PACs are not illegal and are widely used, including by recent presidential candidates.

{¶36} There were also discussions of why Yavorcik's supporters disliked Gains and that many attorneys were concerned about supporting Yavorcik against Gains due to

---

[7] A 527 organization is a tax-exempt entity created under 26 U.S.C. 527 that allows partisan political activity. *McConnell v. FEC*, 540 U.S. 93, 174, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), fn. 67.

potential retribution. The relationship between Gains and the Cafaro family was rather contentious, and the Cafaro family historically supported Gains's campaign opponents, including one launched by a Cafaro in-house attorney several years earlier.

{¶37} Yavorcik states in the FBI recordings that he did not believe the Oakhill Renaissance activities were illegal, and that it was his opinion that it was unethical for Gains, as prosecutor, to prosecute his own clients, the county officials. The latter opinion is supported by the ultimate request by Gains, a year after the grand jury subpoenas were issued by Gains's office, for appointment of three special prosecutors recommended by Gains to handle the cases due to the conflict of interest. Gains advised that the subpoenas were issued by his office at the request of the OEC.

{¶38} Gains, who has been prosecutor since 1982, testified that he was a former policeman who was sworn in as prosecutor after the scheduled date because he was shot in his home for refusing to accept "mafia money." (Tr. 1949.) Gains alternately was not aware or could not recall that Yavorcik supported Gains's opponent in the primary, was supported by certain judges, was endorsed by the police union during his campaign, or that he told others regarding Yavorcik, "f**k that punk." (Tr. 2011.) Gains did recall that when Yavorcik applied for a job with his office, he refused to hire him because of the circumstances surrounding Yavorcik's departure from the Youngstown's prosecutor's office.

{¶39} When working for the city, Yavorcik discovered that the city was arresting people and charging them with a crime on Friday, and those arrested would have to

remain in jail through the weekend without arraignment. At the Monday hearing, "the charges would mysteriously disappear." (Tr. 2012.) Yavorcik resigned on a Friday, sued the city the following Monday and later was awarded $10,000 for legal fees. (Tr. 2011.) Gains stated that Yavorcik was motivated by profit.

{¶40} Gains has known the Cafaros for years and said that he did not consider the Cafaros to be political enemies but he does not like Cafaro, Sr. Gains admitted that he was angry that Yavorcik entered the campaign and was allowed to remain on the ballot. He felt that Yavorcik's campaign as an Independent was a lie because he was really a Democrat. Gains also denied disliking Yavorcik, saying he had no feelings about him either way.

{¶41} The $120,000 amount of the Cafaro contributions was a point of focus by the state. Gains testified that he had never heard of campaign contributions as significant as those made to Yavorcik by the Cafaros, though he admitted that it was not illegal.

{¶42}    Another mainstay of the state's case was that Yavorcik intentionally and expressly cooperated with the asserted cover-up.   The county public officials who testified in the case, each of whom were indicted in other cases or in the instant case, testified under plea agreements with transactional immunity and an agreement to cooperate with the prosecution. Every official testified that they "believed," "thought," or was "of the impression" that, if Yavorcik was elected, the investigation would stop. This was so in spite of the fact that, as Gains testified, the OEC and sheriff's department were driving the investigation and special prosecutors had been appointed by the court so there would be no conflict of interest by the county prosecutor's office.

{¶43}    Antonini's boyfriend, Michael Kurt Welsh ("Welsh"), also testifying under a plea agreement based on his cooperation in the case, stated that he "believed" Yavorcik would be more favorable than Gains in light of the Oakhill Renaissance investigations, which he labeled as a "witch hunt," and Welsh's pending legal problems. (Tr. 2171.)   Welsh was a heavy drinker and faced multiple DUIs and a felonious assault case.

{¶44} Welsh talked with Yavorcik about representing him.   Welsh was often inebriated, including when speaking with Yavorcik on surveillance recordings. Yavorcik did not represent Welsh in any of his cases.   Welsh told the state during his proffer meetings for the current case that he was concerned that if Gains found out that he worked on Yavorcik's campaign, he would be treated unfairly in his pending cases.   (Tr. 2198.)

**{¶45}** The state also pointed to certain fiscal activities as evidence of corruption and conspiracy such as a campaign finance report entry that listed a $250 campaign donation as a loan. Agent Hassman testified that he has worked in the Youngstown area for 20 years and investigates financial crimes with a focus on public corruption. The FBI, who already had several county officials under investigation, assisted the county sheriff's department and OEC:

> The allegations that were surfacing was that a number of public officials started having private concealed contacts with the Cafaro family and the Cafaro lawyers and that those contacts were not transparent and in an adverse position to the official position of Mahoning County who officially had voted two to one to move Job and Family Services and to purchase the building.

(Tr. 2262.) Agent Hassman also reviewed the records of the Cuyahoga Firms.

**{¶46}** In March 2010, Agent Hassman and Special Agent Mike Pikunas ("Agent Pikunas") interviewed Yavorcik at his residence. Yavorcik told them that one of the individuals that he approached for campaign support was Cafaro, Sr. who told Yavorcik he would be willing to make a contribution after the campaign finance deadline prior to the general election. Cafaro Sr. advised him that it was legal to do so and it was not unusual to borrow funds to sustain a campaign and later repay the loan.

**{¶47}** J.J. Cafaro, F. Cafaro, and Cafaro, Sr. each contributed a check to the campaign for $40,000. The checks were issued on October 16, and 17, 2008. Agent Hassman's calculation of Yavorcik's available cash for the campaign, after deducting loans from Yavorcik, family members, and others, was $150,000, $135,000 of

which was sourced to the Cafaros, including the $15,000 provided by F. Cafaro to fund the political poll.

{¶48} The primary campaign finance and strategy meeting participants were Antonini, Sciortino, McNally, Reardon, Bishop Jennings, a prominent local pastor, Herman Hill, a politically active councilman, and Khaled Tabbara, a media consultant working with the campaign.

{¶49} Some public officials stated during the secretly recorded meetings that their "'asses were on the line.'" (Tr. 2279.) Meeting attendees were aware of the Cafaros' contributions because the topic sometimes came up. Committee members confirmed to Yavorcik that he could properly borrow campaign funds and pay them back later when received.

{¶50} Agent Hassman read from several 2008 campaign finance reports. Yavorcik's October 23, 2008 report listed $2,500 loans each from the committees of Reardon, Sciortino for auditor, and Antonini for treasurer. Reardon's campaign finance report listed a $2,500 amount as a donation, indicating no need for repayment.

{¶51} Yavorcik's post-general election December 12, 2008 report did not indicate cash contributions from several individuals including $200 from McNally though cash contributions occurring by November 3, 2008, must be listed. Agent Hassman stated that the report had not been amended as of two days prior to his testimony.

{¶52} The $15,000 poll check Yavorcik received to secure a poll to gauge the possibility of a successful campaign was deposited into Yavorcik's personal account.

Yavorcik issued a check for that amount to the polling company. According to Agent Hassman, the funds flowed from "Flora Cafaro personally to the Cafaro [Co.] checking account" to Yavorcik. (Tr. 2290.) Polls are legitimate campaign expenses for campaign accounts when properly reported.

{¶53} A March 20, 2008 "receipt or invoice" was issued by Yavorcik to "William M. Cafaro/American Gladiator Fitness Center." (Tr. 2290.) The invoice is for "services rendered" from February 20, 2008. Agent Hassman speculated that the document was backdated to reflect services rendered prior to Yavorcik's filing of his intention to run for office on February 22, 2008.[8]

{¶54} An FBI video surveillance contains a conversation during which campaign committee members discussed making cash payments to the poll workers. The state argued that Yavorcik was aware of the conversation but failed to include the information on his financial reports. Yavorcik advised that he was not in the room at that time, as the video appears to confirm, and was not aware of the payments.

{¶55} Also during the October 2010 interview, Yavorcik stated he was aware that Gains initiated a referral to the OEC regarding Oakhill Renaissance. On the question of Yavorcik's motives in entering the prosecutorial race, Agent Hassford attributed the following statements to Yavorcik:

---

[8] Agent Hassman testified that the gym was owned by F. Cafaro's son who said he had never met Yavorcik.

Counsel: Did you question the defendant about the motives of the public officials who were helping him in his 2008 campaign?

Witness: I did.

Counsel: What did the defendant tell you?

Witness: He acknowledged that *looking back* he felt that the public officials who were helping him may have had ulterior, other motivations in wanting him to get elected. He said they wanted him to be the prosecutor because they thought that he might — that they might want him to be prosecutor because they thought he might be willing to do something illegal. *Yavorcik, on March 2nd, to me denied that it was his intention to do something illegal.*

Counsel: Did the defendant summarize his thoughts to you about how he felt about the 2008 campaign?

Witness: He did.

Counsel: And what did the defendant tell you?

Witness: I'll caption my answer by saying, I'm going to use a curse word. This is a curse word of Mr. Yavorcik to me. He said that he felt he was kind of, quote, a fucking puppet, unquote, and he was disgusted by it.

(Emphasis added.)   (Tr. 2297.)

**{¶56}** Yavorcik timely appeals his convictions.

## II. Assignments of Error

**{¶57}** Yavorcik poses seven assigned errors for review:

I. The trial court erred by failing to prepare and seal the grand jury proceedings for appellate review.

II. The state failed to establish that Cuyahoga County had venue to charge the appellant.

III.    The trial court erred in overruling a defense motion for cause in relation to a prospective juror who failed to demonstrate sufficient impartiality.

IV.    The evidence is insufficient to sustain convictions under Counts One and Three of the Indictment, RICO and conspiracy respectively.

V.    The trial court erred when it denied the appellant's motion to dismiss for the state's use of general criminal law provisions over specific election statutes.

VI.    The evidence is insufficient to sustain convictions for tampering with evidence in violation of R.C. 2921.12(A).

VII.    The evidence is insufficient to prove the bribery offenses, Counts 8, 9 and 10, because the state failed to prove Yavorcik was a "candidate" certified in accordance with the Revised Code for placement on the official ballot of the 2008 general election.

## III.    Discussion

### A.    Venue

{¶58}    We address appellant's second assignment of error first because it is dispositive of this case.    We find that the state failed to establish venue in Cuyahoga County to charge and try the appellant.

{¶59} On October 9, 2015, the trial court issued a summary denial of appellant's pretrial motion to dismiss for improper venue. On December 11, 2015, in response to similar motions filed by Sciortino and McNally, the trial court, citing *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, required that the state amend the indictments to reflect in which county the corresponding charge occurred and to "specify which of the [R.C. 2901.12(H)] 'course of conduct' type or types it alleges the evidence will prove in this case."    *See* judgment entry No. 92083850 (Dec. 11, 2015), at pg. 2.

{¶60} On March 24, 2016, the state filed an amended indictment specifying Cuyahoga County as the location of the law firms that provided information and advice to individuals in Mahoning County. The "affairs of the Enterprise" took place in "Cuyahoga County as well as in other counties and in other states and include but are not limited to money laundering, telecommunications fraud, tampering with records, bribery, perjury and theft in office."

{¶61} On April 20, 2016, the trial court denied appellant's motion for judgment of acquittal under Crim.R. 29(C) based on improper venue. Appellant argued that the state failed to prove venue under R.C. 2901.12(H)(3) or (4) for Count 1, pattern of corrupt activity, and Count 3, conspiracy to engage in a pattern of corrupt activity. As a result of that failure, Yavorcik offered that venue was also improper for the remaining counts. The trial court responded:

> Defendant Yavorcik's motion for acquittal is denied. The motion begins with a false premise. It posits that the state's failure to prove venue for count 1, engaging in a pattern of corrupt activity, and count 3, conspiracy to engage in a pattern of corrupt activity, would necessarily mean that no venue could be established for the remaining counts in the indictment in which defendant was found guilty. The defendant ignores the fact that for each count, the court defined the term "in Cuyahoga County" to have a broader meaning than merely limiting all activity to having occurred within the borders of Cuyahoga County. The jury was instructed that each of the counts represented a distinct and independent question from the other counts; the jury was instructed that the counts were not inter-related with each other. In all other respects the motion for acquittal has no merit.

Judgment entry No. 93768067 (Apr. 20, 2016), pg. 1.

{¶62} "The standard that applies to Crim.R. 29(A) motions also applies to Crim.R. 29(C) motions." *Akron v. McDaniels*, 9th Dist. Summit No. 21661,

2004-Ohio-599, ¶ 5, citing *State v. Huffman*, 38 Ohio App.3d 84, 97, 526 N.E.2d 85 (9th Dist.1987). "A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence." *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. We consider whether the state has met its burden of production at trial. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing

*State v. Thompkins*, 78 Ohio St.3d 380, 390, 1997-Ohio-52, 678 N.E.2d 541.

**{¶63}** Ohio Constitution, Article I, Section 10, provides an accused the right to "a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed." This constitutional provision "'fixes venue, or the proper place to try a criminal matter.'" *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, 983 N.E.2d 324, ¶ 19, quoting *State v. Headley*, 6 Ohio St.3d 475, 477, 453 N.E.2d 716 (1983) (explaining that the venue provision of the Ohio Constitution embodies the rule "that the place of trial is to be where the offense occurred.")

**{¶64}** The state must prove that venue is proper beyond a reasonable doubt. *Hampton* at 451-452. "Evidence of proper venue must be presented in order to sustain a conviction for an offense." *Hampton* at 451, citing *Headley* at 477. Also,

> Over a century of well-established jurisprudence clearly mandates that a motion for judgment of acquittal must be granted when the evidence is insufficient for reasonable minds to find that venue is proper. Here, it is undisputed that all of the events in question occurred in Fairfield County, not Franklin County, as alleged in the indictment. Under *Headley*, Crim.R. 29, R.C. 2901.12, and the well-established common-law rule set forth in cases like [*State v. Nevius*, 147 Ohio St. 263, 71 N.E.2d 258 (1947), superceded by R.C. 2901.12(H)], a judgment of acquittal may be entered when the state has failed at trial to prove the venue of the offense as alleged in the indictment.

*Hampton* at 452.

{¶65}   R.C. 2901.12(H) governing venue in criminal cases provides in pertinent part:

> (H)   When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:   * * *
>
> (3)   The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.
>
> (4)   The offenses were committed in furtherance of the same conspiracy.

## B.   Amended Indictment

{¶66}   According to Count 1 of the amended indictment, "on or about January 1, 2005 to January 1, 2009," McNally, Sciortino, and Yavorcik and a host of others engaged in a criminal enterprise to conduct a pattern of corrupt activities under the Ohio Racketeering Influenced and Corrupt Organizations ("RICO"[9]) statute, R.C. Chapter 2923.   "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity."   R.C. 2923.32(A)(1).

---

[9]   Ohio courts interchangeably identify the Ohio Act as "OCPA" and "RICO."   We will employ RICO.

**{¶67}** The enterprise is defined as

> [A]n association and/or organization and/or group of persons and/or companies associated in fact, although not a legal entity, including but not limited to Businessman 1, Business 1, Business 2, Businesswoman 1, Businessman 2, Michael Sciortino, John McNally, Martin Yavorcik, John Zachariah, Law Firm 1, Lisa Antonini, John Doe 1, John Doe 2, Attorney 1, Attorney 2, Attorney 3, Attorney 4, Richard Goldberg, Campaign Committees for Lisa Antonini and Martin Yavorcik, Law Firm 2, Attorney 8, and others known and unknown.

Amended Indictment, pg. 1.

**{¶68}** The type of enterprise is identified as an "Association in Fact Enterprise"

under R.C. 2932.32:

> (1) [It] was an ongoing organization with a commonality of purpose or a guiding mechanism to direct the organization or (2) was a continuing unit with an ascertainable structure and/or (3) had an organizational structure that was distinct from the pattern of predicate acts. As an alternative to point (3), this Enterprise is an illicit enterprise under R. C. Section 2932.32 because it had an organizational structure distinct from the pattern of predicate acts whether or not this enterprise performed any legal acts. The persons and/or companies associated with the Enterprise performed, from time to time, some lawful acts while working for entities connected with the Enterprise, and as a result, this Enterprise existed separate and apart from the pattern of corrupt activity described in this Indictment.

*Id.*

**{¶69}** Yavorcik's role in the enterprise was serving as a:

> [C]andidate to become the Mahoning County Prosecutor running as an Independent in the November 2008 election. Yavorcik accepted benefits in the form of money and services from Lisa Antonini, Businessman 1, Michael Sciortino, others and John McNally so that in the event he became county prosecutor in January of 2009 none of these people would be prosecuted or investigated. Former Attorney Richard Goldberg [10] was

---

[10] According to the amended indictment, Richard Goldberg, "disbarred for stealing hundreds of thousands of dollars from clients" was allegedly "involved in recruiting" Yavorcik in

involved in Yavorcik's attempt to become Mahoning County Prosecutor. Yavorcik further filed false campaign finance reports, created a false receipt, and tampered with records. He has also stated that he would fix cases in two court systems in Mahoning County.

Amended Indictment, pg. 6.

{¶70} A review of the entire amended indictment reveals that, in spite of the broad scope of the county descriptions employed therein, the sole conduct attributed to Cuyahoga County is: OVM's retention of legal services by the Cuyahoga Firms whose services were shared with McNally and Sciortini, a facsimile from McNally to the Cuyahoga Firms transmitting a copy of the offer sheet the county was submitting to the bankruptcy court,[11] and allegations that the Cuyahoga County law firms withheld information requested by the grand jury regarding the Oakhill Renaissance taxpayers' suit.

{¶71} The "scheme or phases" segment of the enterprise lists activities conducted "within the scope of the Enterprise and in furtherance of its affairs." The activities involving Yavorcik relate solely to the prosecutorial campaign:

(1) Yavorcik agreed to accept the bulk of his campaign funds from certain business people and "accept any conditions directly or indirectly attached to the receipt of such funds,"

(2) Yavorcik "offered" to fix two court cases in Mahoning County for a person associated with one of his campaign supporters,

---

2007 to run for prosecutor in 2008. Goldberg is reportedly a close friend of unindicted "Businessman 1" believed to be Carfaro, Sr.

[11] It is asserted that the offer was prepared during an executive session, the public meetings exception under R.C. 121.22, and was therefore confidential.

(3) certain individuals contributed to Yavorcik's campaign to "obtain or buy improper influence," and/or with the understanding that they "would not be prosecuted or investigated for conduct from January 2005 to August 2007 (Oakhill Renaissance),"

(4) certain individuals contributed to Yavorcik's campaign, and

(5) improper filing of campaign finance reports.

Amended Indictment, pg. 9.

{¶72} Also, pertinent to the venue analysis here is the Amended Indictment's description of Count 3 that is conspiracy to "commit, promote or facilitate the commission of Engaging in a Pattern of Corrupt Activity." *Id*. at 25. The Cuyahoga County law firms and attorneys are not listed. The "substantial overt act[s]" conducted in furtherance of the conspiracy are described:

> John McNally and Mike Sciortino filed false ethics reports, when John McNally, Mike Sciortino, and John Zachariah committed perjury, when Business 1 and/or Business 2 provided a benefit to John McNally, Mike Sciortino, and John Zachariah to exert improper influence over the same and when Martin Yavorcik accepted benefits from various people to improperly influence him namely money, services or other benefits from Businessman 1, Businesswoman 1, John McNally, Lisa Antonini, Michael Sciortino, and others.

*Id*.

## C.    Jury Instructions

{¶73} The trial court instructed the jury:

> Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about January 1, 2005, to January 1, 2009, and in Cuyahoga County, Ohio, the defendant, while associated with an enterprise, did directly or indirectly conduct or participate in the affairs of the enterprise through a pattern of corrupt activity.

(Tr. 2636.)

{¶74} The trial court defined "enterprise," "conduct," "participate in" and "pattern of corrupt activity."

> Enterprise includes any organization, association, or group of persons associated in fact although it was not a legal entity. So enterprise includes illicit enterprises as well as enterprises who conform with the requirements of the law.

> Let me define for you the word conduct. It means to direct.

> Participate in means to take part in. It is not limited to those who have directed the pattern of corrupt activity. Participate includes performing activities necessary or helpful to the operation of the enterprise, whether directly or indirectly, without an element of control over the enterprise.

> Now I want to define for you a pattern of corrupt activity. This means two or more incidents of corrupt activity that are related to the affairs of the same enterprise, that are not isolated, and that are not so closely related to each other and connected in time and place that they constitute a single event. An incident of corrupt activity does not require a prior conviction for a crime.

> * * *

> Now let me define for you corrupt activity. That means engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing or intimidating another person to engage in one or more certain criminal offenses, namely, the offenses of bribery, tampering with records, money laundering, tampering with evidence, telecommunications fraud and perjury.

(Tr. 2637-2639.)

{¶75} As to the conspiracy venue nexus with Cuyahoga County, the trial court explained:

In Cuyahoga County. This element in each of the criminal offenses charged in this case in Cuyahoga County requires this explanation: The State has to prove that one or more of the criminal offenses or any element of one of the offenses occurred in Cuyahoga County. The State alleges that the defendant committed offenses as part of a course of criminal conduct. Specifically, the State alleges the offenses that the defendant is accused of were committed in furtherance of a conspiracy.

A conspiracy is the planning or aiding in the planning of the commission of an offense with one or more other persons with a purpose to commit, promote or facilitate the commission of the specific offense. A conspiracy is agreeing with one or more persons that one or more of them will engage in conduct with a purpose to commit, promote or facilitate the commission of the specific offense.

(Tr. 2642-2643.)

### D. Analysis

{¶76} It is undisputed that the state must establish venue beyond a reasonable doubt. In cases involving the commission of offenses in more than one jurisdiction "as part of a course of criminal conduct, venue lies for all the offenses in any jurisdiction in which the offender committed one of the offenses or any element thereof." R.C. 2901.12(H). *State v. Sparks*, 2014-Ohio-1130, 10 N.E.3d 755, ¶ 15 (12th Dist.).

{¶77} It is also undisputed that the predicate offenses with which Yavorcik was allegedly involved all took place in Mahoning County between November 2007 and January 2009.[12] To vest jurisdiction in Cuyahoga County, the state must establish that

---

[12] The amended indictment lists the date range of offenses as January 1, 2005 to July 18, 2014. The period for the conspiracy count is January 1, 2005 to February 1, 2014. The offense periods for Yavorcik's charges begin on March 1, 2008 with December 12, 2008 being the latest.

Yavorcik was part of the alleged enterprise that engaged in a pattern of corrupt activity, and that a,

> "[S]ubstantial overt act in furtherance of the conspiracy is alleged and proved to have been done [in Cuyahoga County] by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed.

R.C. 2923.01(B). Therefore, we observe that a finding as to venue on the issue of corrupt activity under R.C. 2923.32(A)(1) concurrently resolves the charge of conspiracy to engage in a pattern of corrupt activity under R.C. 2923.01(A)(1).

{¶78} In consideration of the RICO claim, we examine: (1) "'the common purpose of the individuals involved'"; (2) "'their combined efforts in pursuing such common purpose'"; and (3) "'their relationship with one another.'" *Bradley v. Miller*, 96 F.Supp.3d 753, 784 (S.D.Ohio 2015), quoting *State v. Sparks*, 2014-Ohio-1130, 10 N.E.3d 755, ¶ 31 (12th Dist.).

{¶79} Ohio courts considering state RICO claims under R.C. 2932.32 are guided by federal RICO analyses. *Wuliger v. Keybank Natl. Assn.*, N.D.Ohio No. 3:02 CV 2160, 2006 U.S. Dist. LEXIS 315, at *10 (Jan. 6, 2006), citing *FRC Internatl., Inc. v. Taifun Feuerloschgeratebau Und Vertriebs Gmbh*, N.D.Ohio No. 3:01 CV 7533, 2002 U.S. Dist. LEXIS 17559 at *12 (Sept. 4, 2002), *DeNune v. Consol. Capital of N. Am., Inc.*, 288 F.Supp.2d 844 (N.D. Ohio 2003).

{¶80} As the trial court instructed the jury, "[a]n association-in-fact enterprise" is "'a group of persons associated together for a common purpose of engaging in a

course of conduct.'" *State v. Beverly*, 143 Ohio St.3d 258, 2015-Ohio-219, 37 N.E.3d 116, ¶ 9, quoting *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), and *Boyle v. United States*, 556 U.S. 938, 948, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009) ("an association-in-fact enterprise is simply a continuing unit that functions with a common purpose"); *see also* R.C. 2901.12(H)(3) ("in furtherance of the same purpose or objective") and R.C. 2901.12(H)(4) ("in furtherance of the same conspiracy.").

{¶81} The amended indictment describes the common purpose of the enterprise.

> From January of 2005 to January of 2009 the *common purpose* of the Enterprise regarding its ongoing illegal conduct was to improperly influence elected officials in Mahoning County with money and legal services which were provided from Cuyahoga County, Ohio, Mahoning County, Ohio *and then* to cover up, obstruct or illegally hide such conduct by the commission of perjury, bribery, and by concealing or falsifying campaign income.

(Emphasis added.)   Amended Indictment, pg. 10.

{¶82} The state must also demonstrate the commission of two or more predicate offenses, also referred to as predicate acts, to substantiate a pattern of corrupt activity, even though a prior conviction on those offenses is not required.   R.C. 2923.31(E). The offenses must be "related to the affairs of the same enterprise," they must not be "isolated, and not so closely related to each other and connected in time and place that they constitute a single event."   *Id.*

{¶83} The amended indictment lists an array of venue alternatives for the predicate offenses: "[t]he Grand Jury further finds that the following incidents directly or indirectly

affected the affairs of the enterprise and occurred in Cuyahoga, Franklin, Geauga and/or Mahoning County, Ohio." Those acts are: perjury, bribery, tampering with evidence, tampering with records, money laundering, theft in office, and telecommunications fraud. Amended Indictment, pg. 13–24.

**{¶84}** "The standard to establish venue" is whether Yavorcik has a "'significant nexus' with the county where the trial was held." *State v. Hackworth*, 80 Ohio App.3d 362, 365-366, 609 N.E.2d 228 (6th Dist.1992) quoting *State v. Draggo*, 65 Ohio St.2d 88, 92, 418 N.E.2d 1343, 1346 (1982). We examine the record to determine whether the standard has been met in this case.

### 1. The Oakhill Renaissance Enterprise Conspiracy 2005 to 2007

**{¶85}** The record does not support that any of the predicate offenses attributed to Yavorcik occurred in Cuyahoga County. The state argues that venue is proper because the legal services provided by the Cuyahoga County-based legal counsel relating to the Oakhill Renaissance matter constituted "incidents of corrupt activity in furtherance of the enterprise [that] occurred within Cuyahoga County," citing *United States v. Rosenberg*, 888 F.2d 1406, 1415 (D.C. Cir.1989), citing *Hyde & Schneider v. United States*, 225 U.S. 347, 363-364, 56 L.Ed.1114, 32 S.Ct. 793 (1912).

{¶86} McNally and Sciortino publicly opposed the Oakhill Renaissance purchase for vocalized reasons. Their resistance was not covert. On that basis, they requested that Gains appoint counsel for them. Gains refused. McNally and Sciortino next asked the court to appoint counsel. The request was denied, and the appeal of that issue was not decided until the Oakhill Renaissance matters had concluded. In the meantime, as licensed attorneys, they proceeded pro se, with guidance from the Cuyahoga Firms hired by OVM.

{¶87} There is no evidence that the Cuyahoga Firms engaged in illegal overt activities in furtherance of the alleged conspiracy. In fact, J.J. Cafaro testified to being called into a meeting attended by Cafaro, Sr., in-house counsel Dobran, McNally, Sciortino and members of the Cuyahoga Firms. J.J. Cafaro sought assurance from the attorneys that it was legal for OVM to share work product with the county officials. The attorneys responded,

> [A]bsolutely we can do this. It is done all the time. It is not unusual for attorneys to exchange work product when their clients have a mutual interest in a given issue. And in this issue, they felt the attorneys had like interests and the principals had like interests and they said there was no problem in sharing work product.

(Tr. 1400.) "Once I got the opinion it was okay to do it, I never gave it another thought." (Tr. 1401.)

{¶88} In spite of the number of business persons, companies, officials, law firms, attorneys, and known and unknown associates of the Oakhill Renaissance enterprise, only McNally, Sciortino and Yavorcik were charged in the amended

indictment in this case. The asserted common purpose of the Oakhill Renaissance enterprise was to "improperly influence elected officials in Mahoning County with money and legal services" to prevent the county from purchasing Oakhill Renaissance and relocating JFS to the facility. The sole event involving Cuyahoga County was the retention of, and services rendered by, the Cuyahoga Firms involving Yavorcik's alleged "co-conspirators."

{¶89} Twenty-six witnesses testified in the case including FBI agents, Cafaro Co. employees, J.J. Cafaro, Traficanti, McNally, Reardon, Zachariah, Antonini, an attorney formerly with one of the Cuyahoga Firms, and members of the county prosecutor's office including Gains. The witnesses referenced in the amended indictment, though not indicted in the instant case, testified with transactional immunity and an agreement to cooperate with the prosecution. No testimony or evidence was introduced to show that Yavorcik was involved with any of the Oakhill Renaissance activities.

{¶90} Yavorcik is not named in the letter issued by Gains to the OEC on October 31, 2007, alleging ethical violations by "certain officials" relating to the Oakhill Renaissance matter. The description of activities and dates cited in the amended indictment as to Yavorcik also support the conclusion that Yavorcik had no involvement with the Oakhill Renaissance enterprise. The first time that Yavorcik was recorded by FBI informant Strabala was on February 28, 2008, relating to legitimate campaign activities.

{¶91} The Oakhill Renaissance matter concluded in October 2007. The

taxpayers' suit was dismissed in October 2007 and title to the facility had transferred. The common purpose of the alleged criminal enterprise to "improperly influence elected officials in Mahoning County with money and legal services" to stop the move of JFS to Oakhill Renaissance concluded.

### 2. The Prosecutorial Campaign Enterprise Conspiracy, November 2007 to January 2009

**{¶92}** We next address the second common purpose of the enterprise: "*and then*, to cover up, obstruct or illegally hide" the Oakhill Renaissance conspiracy "by the commission of perjury, bribery, and by concealing or falsifying campaign income." Here, the purpose of the enterprise, as well as its membership, has undergone a metamorphosis.

**{¶93}** The record confirms that Yavorcik played no part in the Oakhill Renaissance conspiracy. None of the witnesses testified that Yavorcik was recruited to run for prosecutor. Instead, the testimony reveals that Yavorcik announced his campaign intentions and sought support from individuals including the alleged enterprise members.

**{¶94}** The evidence also fails to support that Yavorcik decided to run for prosecutor so that, as "super prosecutor," he could interfere with the activities of the FBI, County sheriff, OEC, and the appointed special prosecutors, to halt all investigations regarding the alleged enterprise members.

**{¶95}** Reardon testified that he did not believe that he and the others committed any crimes, and felt that the investigation was politically motivated. Reardon learned that Yavorcik, whom he had known for a number of years, was running for prosecutor when he heard it "in the news," and he approached Yavorcik to ask how he could be involved with the campaign. (Tr. 2243.)

**{¶96}** Reardon was not told that Yavorcik would halt the investigation. "I assumed it would go away." (Tr. 2255.) "[T]ruthfully, long prior to [meeting with Yavorcik], I had assumed that [the investigation] would go away if Paul Gains was no longer the prosecutor." (Tr. 2255.) "I felt and still do that Paul Gains was politically motivated in going after us in trying to bring down his political enemies." (Tr. 2256.)

**{¶97}** Antonini said that she "believed" that a prosecutor would have the power to impede or stop an active investigation. (Tr. 2161.) Antonini's boyfriend, Welsh, who suffered from alcoholism and legal problems, said that he supported Yavorcik because of a "belief" that Yavorcik would be more favorable to his legal concerns with multiple DUIs and a pending felonious assault case than Gains. (Tr. 2171.)

**{¶98}** Welsh also believed the Oakhill Renaissance investigation was a "witch hunt" and he "was hopeful that" Yavorcik's becoming prosecutor "would benefit people that I was associated with." (Tr. 2170-2171.) Welsh's additional concern was that working on Yavorcik's campaign would work against him if Gains remained in office.

**{¶99}** McNally never had an agreement with Yavorcik to help him get elected and was not aware of any "arrangements" between Yavorcik and Antonini, Welsh,

Reardon, Sciortino, or Cafaro, Sr. (Tr. 1582.) "They" were all "upset," felt that they were being treated unfairly and believed that "there was a fair amount of politics involved" in the investigations. (Tr. 1620.)

{¶100} Without establishing that Yavorcik engaged in a conspiracy underlying the pattern of corrupt activity, venue is extinguished. We reiterate:

> A "pattern of corrupt activity" means "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." [R.C.] 2923.31(E). "The commission of two incidents of corrupt activity alone is insufficient to demonstrate a pattern of corrupt activity." *Morrow v. Reminger & Reminger Co., L.P.A.*, 183 Ohio App.3d 40, 2009-Ohio-2665, 915 N.E.2d 696, 708 [10th Dist.], "a pattern of corrupt activity under the OCPA requires that predicate crimes be related and pose a threat of continued criminal activity." *Id.*

*Bradley v. Miller*, 96 F. Supp.3d 753, 772-773 (S.D.Ohio 2015).

{¶101} Viewed in a light most favorable to the prosecution, this court finds that the evidence is insufficient to support that the Oakhill Renaissance matter and the prosecutorial campaign are conspiracies that constitute "'two or more incidents of corrupt activity'" that are "'related to the affairs of the same enterprise,'" *id.* at 773, and were formed for a common purpose. *Id.* at 784.

{¶102} Yavorcik had no involvement with the Oakhill Renaissance matter. Assuming that any of the activities relating to Oakhill Renaissance were illegal, at best Oakhill Renaissance was a single conspiracy unrelated to Yavorcik. A RICO violation will not be "established by a showing that various defendants engaged in RICO predicate crimes 'independently and without coordination.'" *United Food & Commercial Worker*

*Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir.2013), citing *Boyle*, 556 U.S. at 947, fn. 4. The state may not "boot-strap" an inference that those illegal activities must have been conducted on behalf of a RICO enterprise. *Id.* at 855.

{¶103} Conversely, it may be stated that the Oakhill Renaissance matter and the alleged prosecutorial campaign cover-up are so closely related to each other and connected in time and place that they constitute a single event. R.C. 2923.31. In that case, there is no venue in Cuyahoga County either, because a pattern of corrupt activity has not been established, and the conspiracy is the predicate act underlying the unproven pattern of corrupt activity charge.

{¶104} The evidence demonstrates that Yavorcik's nexus with Cuyahoga County is nonexistent. *Hackworth*, 80 Ohio App.3d 362, 365-366, 609 N.E.2d 228, quoting *Draggo*, 65 Ohio St.2d 88, 92, 418 N.E.2d 1343.

{¶105} We further find that the state has failed to establish Yavorcik was part of an "association in fact" for RICO purposes:

> To establish an "association in fact" under R.C. 2923.31(C), there must be "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle [v. United States],* 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265, 1276 [2009], "[M]erely committing successive or related crimes is not sufficient to rise to the level of a RICO violation." *State v. Schlosser,* 79 Ohio St.3d 329, 333, 681 N.E.2d 911 (1997).

*State v. Sultaana*, 2016-Ohio-199, 57 N.E.3d 433, ¶ 18 (8th Dist.). The listed factors are lacking here.

**{¶106}** The attempt to connect the alleged cover-up activities to the Oakhill Renaissance conspiracy does not "constitute a basis for establishing an open-ended scheme or threat of repetition" that is sufficient "to satisfy the continuity requirement" of a pattern of corrupt activity. *Knit With v. Knitting Fever, Inc*., 625 Fed.Appx. 27, 38 (3d Cir.2015), quoting *Davis v. Grusemeyer,* 996 F.2d 617, 623 (3d Cir. 1993).

**{¶107}** Based on the foregoing findings, the trial court erred in denying Yavorcik's Crim.R. 29(C) motion for judgment of acquittal for lack of venue. As a result, Yavorcik's convictions cannot stand. "It is mandatory that venue be proven beyond a reasonable doubt before a conviction can be sustained." *State v. Gonzalez,* 188 Ohio App.3d 121, 2010-Ohio-982, 934 N.E.2d 948, ¶ 9 (3d Dist.), citing *State v. Dickerson*, 77 Ohio St. 34, 82 N.E. 969 (1907). "A judgment of acquittal may be entered when the state has failed at trial to prove the venue of the offense as alleged in the indictment." *Hampton*, 134 Ohio St.3d 447, 452, 2012-Ohio-5688, 983 N.E.2d 324.

**{¶108}** Our finding on the issue of venue renders the remaining assigned errors, as well as the state's cross-appeal moot. App.R. 12(A). The case is remanded to the trial court to vacate the judgment.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

KATHLEEN ANN KEOUGH, P.J., CONCURS IN JUDGMENT ONLY;
SEAN C. GALLAGHER, J., CONCURS IN JUDGMENT ONLY WITH SEPARATE OPINION

SEAN C. GALLAGHER, J., CONCURRING IN JUDGMENT ONLY:

{¶109} I concur in judgment only. The state charged Yavorcik because of his campaign pledges, made during the failed attempt to become the Mahoning County Prosecutor in 2008, (1) to end an investigation instigated by the Ohio Ethics Commission, and (2) to prevent a Mahoning County prosecution that apparently never materialized.

{¶110} According to the state, before 2008, a law firm located in Cuyahoga County provided legal advice to members of the alleged conspiracy and it also received a faxed copy of Mahoning County's purchase proposal for the Oakhill Renaissance property that was orally deemed "confidential" under R.C. 102.03(B) by Yavorcik's political opponent — under R.C. 102.99(B) it is a first-degree misdemeanor offense to disclose a document "designated" confidential. The state indicted Yavorcik because of a misdemeanor offense allegedly having been committed by a codefendant within Cuyahoga County before Yavorcik allegedly joined the criminal enterprise. This is a thin argument given the local resources devoted to this prosecution; however, Ohio's criminal

venue statute, R.C. 2901.12(H), is broad.  Thereunder, any offense constitutes a basis for venue, and the misdemeanor suffices to establish venue in Cuyahoga County for that defendant.

{¶111} Although the state repeatedly referred to the local law firm and its attorneys as coconspirators in front of the jury in its attempt to prove venue, nothing in the record substantiates the allegation.  The state contends that the law firm's client authorized the disclosure of work product to a government official, which he used as part of his official, overt effort to prevent the county from purchasing the property, a purchase he believed to be antithetical to the interests of his constituents.  Nothing in the record demonstrates that the law firm engaged in criminal behavior in furtherance of a conspiracy.  Simply providing legal advice to a third party with the consent of a client does not make an attorney a coconspirator for the purposes of establishing venue.  There are no allegations that the law firm was aware of criminal behavior that required reporting or that it knowingly facilitated criminal objectives.

{¶112} The state's position is concerning.  At the least, it creates a chilling effect on criminal defendants seeking attorneys in other jurisdictions to represent them, at the risk of creating venue in another county.  But more important, taking the state's theory to its logical ends, any criminal defense attorney could be considered a coconspirator by merely providing legal advice to a person who may have committed a crime.  That proposition, if accepted, would have devastating consequences for the criminal defense community.

**{¶113}** Nevertheless, I agree that venue has not been established for the offenses with which Yavorcik was charged. "[*E*]*ach defendant* possesses a constitutional right to be tried in the 'district wherein the crime shall have been committed.'" (Emphasis added.) *State ex rel. Dayton Newspapers, Inc. v. Phillips*, 46 Ohio St.2d 457, 526, 351 N.E.2d 127 (1976), citing the Sixth Amendment to the U.S. Constitution and Article I, Section 10, Ohio Constitution. It is an individual right based on the defendant's conduct. Thus, the state must prove venue with respect to Yavorcik and his alleged crimes.

**{¶114}** At trial the state told the jury that

Venue lies in Cuyahoga County because the conspiracy that was formed, because the legal services were paid in Cuyahoga County, legal services were provided by [local law firms] in Cuyahoga County. Faxes, a confidential letter was faxed from John McNally in Youngstown to [the law firm] in Cuyahoga County. That particular fax of that crime, faxing that document is actually a crime disclosing a confidential record. * * * *Once [Yavorcik] is brought in to cover up what those people did, it's just furtherance of the same conspiracy.*

(Emphasis added.) Tr. 2565:22-2566:6, 2567:1-3. The state repeated that argument in this appeal: "At trial, the State showed venue over [*Yavorcik*] *was established in Cuyahoga County by the overt acts of* [*Yavorcik's*] *coconspirators* in relation to the Cleveland law firm, * * * and its involvement in the underlying conspiracy in the Oakhill

[Renaissance] matter." (Emphasis added.) According to the state, because venue may have been proper over crimes allegedly committed by codefendants, the state may prosecute Yavorcik's subsequent concealment efforts as part of the original conspiracy.

{¶115} Venue, although not jurisdictional, is a limit on the state's power to prosecute crimes. On this point, the law regarding the statute of limitations as applied to conspiratorial charges is instructive. The statute of limitations is also not a jurisdictional argument, but is a limit on the state's power to advance charges. *Daniel v. State*, 98 Ohio St.3d 467, 2003-Ohio-1916, 786 N.E.2d 891, ¶ 7, quoting *State ex rel. Tubbs Jones v. Suster*, 84 Ohio St.3d 70, 76, 1998-Ohio-275, 701 N.E.2d 1002. Thus, venue and the statute of limitations as criminal defenses share a common core.

{¶116} As it relates to the statute of limitations, "[a] separate agreement to conceal a conspiracy will not extend the length of a conspiracy * * *" unless the concealment is in furtherance of the main criminal objective. *United States v. Lash*, 937 F.2d 1077 (6th Cir.1991), citing *Grunewald v. United States*, 353 U.S. 391, 397, 1 L.Ed.2d 931, 77 S.Ct. 963 (1957). If the concealment is integral to the original objectives, the concealment acts to extend the life of the conspiracy, in essence being part of one conspiracy or one conspiratorial objective. *Id.* To be considered integral to the original conspiratorial objectives, however, the concealment must be necessary to the successful completion of the crime. *Grunewald* at 405. "A vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose

only of covering up the crime." (Emphasis sic.) *Id.* Concealing the crime does not extend the original conspiracy; it is a separate act. *Id.*

{¶117} In this case, even if the allegations are believed, the conspiracy failed in its objective to prevent Mahoning County from purchasing the Oakhill Renaissance property. The concealment efforts were not integral to the objectives of the original conspiracy. The concealment was for a separate purpose — to prevent a prosecution that never materialized in Mahoning County. Concealment of a crime, if the concealment acts are criminal, is separate from the underlying crime. As it stands, there are two alleged conspiracies in this case: the original failed attempts to prevent Mahoning County from purchasing a property because local officials disagreed whether it would be in the best interest of the county, and the second objective of stalling or preventing any criminal prosecutions stemming from the failed attempt.

{¶118} The conduct underlying the concealment allegations in this case was separate and apart from the original conspiratorial acts. Venue here over Yavorcik's alleged crimes is not proper — none of his offenses occurred in Cuyahoga County. R.C. 2901.12(H); *Grunewald*. The state's sole basis for establishing venue over Yavorcik's offenses, that the post hoc concealment is part or in furtherance of the conspiracy, cannot be accepted.

{¶119} We should heed prior warnings. Courts should "view with disfavor attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." *Grunewald*, 353 U.S. 391, at 404, 77 S.Ct. 963, 1 L.Ed.2d 931.

Precluding the state from establishing venue over the acts facilitating the concealment of a crime, by relying on the acts of the underlying crime, is no different than precluding the state from circumventing the statute of limitations by relying on the concealment to extend the life of the crime. If concealment of a crime is separate for the purposes of determining whether the statute of limitations precludes prosecution, it should be treated as being separate for the purposes of determining whether venue precludes prosecution. Venue must be established over the offenses for which the defendant is charged. R.C. 2901.12(H) ("the offender *may be tried for all those offenses* in any jurisdiction in which one of those offenses or any element of *one of those* offenses occurred." (Emphasis added.)). Because none of the elements of the offenses for which Yavorcik stood trial were based on conduct occurring in Cuyahoga County, the state failed to establish venue. Yavorcik's convictions cannot be sustained.